UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| WARREN ADAMS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  5:18-cv-01443-HNJ |
| | ) | |
| CRESTWOOD MEDICAL CENTER, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION AND ORDER**

This action proceeds before the court on Defendant Crestwood Medical Center's Motion for Summary Judgment.  (Doc. 24).  Plaintiff Warren Adams claims Defendant Crestwood Medical Center ("Crestwood") discriminated against him on the basis of his mental disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended.  The viability of plaintiff's claim primarily hinges on Crestwood tasking Adams with delivering meal trays to hospital patients.  Adams avers his mental disabilities hindered his ability to perform the meal tray delivery duty, and Crestwood failed to reasonably accommodate his mental disabilities vis-à-vis such duty.

The court concludes genuine issues of material fact persist as to whether Adams manifests an intellectual disability, whether serving meal trays constituted an essential function of his employment, and whether the request for relief from the meal tray

delivery duty constituted a reasonable accommodation. Therefore, based upon the following discussion, the court **DENIES** Crestwood's Motion for Summary Judgment.

### STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency." *Id.* at 1116–17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603–04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In addition, a movant may prevail

on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## Background

The undersigned sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Adams.

On July 1, 2015, Crestwood hired Adams to work as a Nutrition Services Tech I (Porter) (hereafter Porter/Dishwasher).[1] (Doc. 26-1 at 48–49). Adams's spouse, Mrs. Tosha Adams, discovered the Porter/Dishwasher position on Indeed.com, and proceeded to apply for the position on Adams's behalf by completing an online

---

[1] Consistent with Crestwood's usage, the court hereinafter refers to this position as "Porter/Dishwasher." *See generally* doc. 26-3.

application and resume.  (Tosha Adams Dep. at 27, l. 23; 31, ll. 2–3 & 6–7).  The resume Mrs. Adams drafted states Adams commenced working as a "Dietary Aid[e]" at Redstone Arsenal MWR in March 2014, a position which he maintained during the relevant period.[2]  (Doc. 26-1 at 53, Warren Adams Dep. at 63, ll. 16–65, l. 15).  The resume further states Adams worked as a "Dietary Aid[e]" at "NHC nursing home" for the period February 2012 to March 2014, and as a "custodian/ dietary [aide]"[3] at Riverview Regional Medical Center for the period February 1990 to February 2012.  (Doc. 26-1 at 53–55).

The resume portrays that Adams performed identical job duties in each afore-cited position, which Mrs. Adams listed as follows:

- Prepare resident trays according to instructions/order
- Delivers food, nourishment and supplies to nursing units
- Operates dish machine and various food service equipment
- Cleans dish machine area and clean and de-lime dish machine
- Stores clean equipment and utensils
- Unloads delivery trucks and put away stock
- Sets up dietary tray cards
- Delivers food carts to resident meal service location areas
- Empties garbage in dumpster and sanitize garbage cans
- Maintains effective communication with residents, families and facility staff
- Follows strict guidelines for serving times

---

[2] During his employment with Crestwood, Adams worked at Redstone Arsenal MWR on the weekends.  (Warren Adams Dep. at 64, ll. 12–14).

[3] The resume labels Adams's Riverview Regional Medical Center position as "custodian/ dietary." (Doc. 26-1 at 55).  Based upon the similar job titles printed on Adams's resume, the court presumes Ms. Adams intended to style the position "custodian/ dietary aide."

- Assists in maintaining preparation and service area in sanitary condition
- Skilled in sweeping and mopping floors

[●] Trained new employees

(Doc. 26-1 at 53–33).

Mrs. Adams averred she lacked "direct knowledge of" Adams's prior job duties and that upon drafting Adams's resume, she "just cut and paste[d] job descriptions that [she] saw on the Internet." (Tosha Adams Dep. at 28, ll. 7–9). As she explained: "I know when [Adams] came home [from work], he told me he washed dishes, and he swept and mopped. That's the only thing I could attest to." (*Id.* at 28, ll. 12–15). Mrs. Adams testified that she did not review the resume with Adams before she submitted it to Crestwood. (*Id.* at 37, ll. 4–8).

After Mrs. Adams submitted Adams's application materials, Lloyd Morrow, Crestwood's Food and Nutrition Services Director, telephoned her to schedule an interview with Adams for the Porter/Dishwasher position.[4] (*Id.* at 32, ll. 17–18). Mrs. Adams testified that the next day, she visited Morrow in person to explain that she would accompany Adams to the interview and complete any paperwork on his behalf. (*Id.* at 33, ll. 3–7; 34, ll. 2–4). According to Mrs. Adams, she explained to Morrow "that [Adams] had a learning disability. He's not able to articulate himself. He's not able to

---

[4] Ms. Adams averred Adams "didn't even have a phone at the time." (Tosha Adams Dep. at 32, l. 19).

6

explain things.  So [she] would have to pretty much do the whole interview for him." (*Id.* at 33, ll. 8–12).

As for the interview, Mrs. Adams testified that she "answered all [of Morrow's] questions" while Adams "pretty much just sat there."  (*Id.* at 34, ll. 7–9).  At the interview, Morrow stated Adams would be "[c]leaning tables and taking out trash." (Tosha Adams Dep. at 36, ll. 10–11).  According to Adams himself, Morrow stated during the interview that Adams's job duties would remain limited to cleaning tables in the cafeteria and removing garbage from the cafeteria, which Adams refers to as "work[ing] in the front."  (Warren Adams Dep. at 47, ll. 9–13).  Adams averred that Morrow "hired [him] to wash tables and take out the garbage can", and "didn't hire [him] for [any]thing else."  (*Id.* at 22, ll. 18–20).  According to Adams, "[t]hat's what the application said."  (*Id.* at 43, ll. 3–4).   Mrs. Adams further testified that Morrow stated Adams would work "Monday through Friday" from "9:00 [a.m.] to 3:30 [p.m.] or 9:30 [a.m.] to 3:00 [p.m.]", with no scheduling variations.  (*Id.* at 36, ll. 15, 22).[5]

---

[5] The court heeds Federal Rule of Evidence 601's admonition that "[e]very person is competent to be a witness unless the[ ] rules provide otherwise," and thus, "[n]o mental or moral qualifications for testifying as a witness are specified." Fed. R. Evid. 601 adv. cmt. note. Nevertheless, given the evidence of Adams's intellectual disability, as elaborated *infra*, Adams's ability to process and understand interactions falls especially to the factfinder at trial in the assessment of his credibility. *United States v. Martino*, 648 F.2d 367, 384–85 (5th Cir. 1981) ("It is left to the jury to assess a witness's credibility and the weight to be accorded his testimony. . . The readily apparent principle is that the jury should, within reason, be informed of all the matters affecting a witness's credibility to aid in their determination of the truth. It all goes to the ability to comprehend, know, and correctly relate the truth."), *on reconsid. in part sub nom. United States v. Holt*, 650 F.2d 651 (5th Cir. 1981), *and on reh'g*, 681 F.2d 952 (5th Cir. 1982), *aff'd sub nom. Russello v. United States*, 464 U.S. 16 (1983) (quoting *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974)); Fed. R. Evid. 601 adv. cmt. Note ("A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence.") (citing

Upon accepting the Porter/Dishwasher position, Adams signed a Position Description.  The Position Description states the Porter/Dishwasher would remain responsible for:

> overall cleanliness of the kitchen to include: cleaning all pots, pans, dishes and utensils utilizing the dishmachine and three (3) compartment sink system; [r]emoval of all trash from kitchen to proper receptacle area; [c]leaning and sanitation of all kitchen equipment to include but not limited to: floors, walls, refrigerators, freezers and storage racks and other duties as assigned.

(*Id.* at 48).

The Position Description further states, in relevant part, the Porter/Dishwasher "[m]ust be able to . . . push carts that weigh approximately 100 pounds."  (*Id.*)  The Position Description asserts it does not constitute "a contract of employment[,] and job duties and responsibilities may change and additional job duties may be requested." (*Id.*)  In addition, the Position Description states that by signing the document, the employee attests that he or she has "reviewed the[] job requirements and verif[ies] that [he or she] can perform the minimum requirements and essential functions of th[e] position."  (*Id.*)

Adams testified he does not remember signing the Position Description, but confirmed the document portrays his signature.  (Warren Adams Dep. at 27, ll. 13–23; 28, ll. 1–11).  Mrs. Adams testified she "would not have read [the Position Description]

---

2 Wigmore §§ 501, 509).

to [Adams]" because "he doesn't understand anything."  (Tosha Adams Dep. at 37, ll. 19–20).  Rather, Mrs. Adams "would have told [Adams] that [the Position Description] is about [his] job" and directed him to "sign it."[6]  (*Id.* at 37, ll. 20–22).

Morrow served as Adams's supervisor during his employment at Crestwood. (Warren Adams Dep. at 45, l. 4; doc. 26-3 at 2, ¶ 3).  Adams testified that when he commenced working as a Porter/Dishwasher, he worked exclusively "in the front" cleaning cafeteria tables and removing garbage from the cafeteria.  (Warren Adams Dep. at 36, ll. 12–22).  Adams does not recall the hours he initially worked, though Adams's time sheet reflects he worked from approximately 9:00 a.m. to approximately 3:00 p.m. for his first five shifts.  (Doc. 26-1 at 49).

---

[6] The court may consider Mrs. Adams's statement as admissible, non-hearsay evidence of Adams's intellectual disability and his lack of notice of the Position Description's contents, as neither mode attempts to prove the truth of the matter asserted in the statement.  *See* Fed. R. Evid. 801(c)(2) ('Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement.");  *Macuba v. DeBoer*, 193 F.3d 1316, 1323–24 (11th Cir 1999) ("[A] statement might be admissible because it . . . does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted) . . . .");  *see also Henderson v. Fedex Express*, 442 F. App'x 502, 505 (11th Cir. 2011) ("[T]he district court considered th[e] testimony not for the truth of the matter asserted—that [the plaintiff] actually fabricated his time card—but as evidence of the decisionmakers' state of mind at the time that they terminated [his] employment. Because the testimony . . . was not hearsay, the district court did not abuse its discretion by considering it.");  *Brown v. Metro. Atlanta RTA*, 261 F. App'x 167, 174 n.9 (11th Cir. 2008) ("The evidence that the lunch meetings included discussions of getting rid of black employees and retaining and promoting whites is Berry's deposition testimony about what Clements and Dendle told her.  This is not hearsay because it need not be offered for the truth of the matter asserted.");  *Benford v. Richards Med. Co.*, 792 F.2d 1537, 1540 (11th Cir. 1986) ("The deposition is evidence that [the defendant] was on notice of the potential problems with using cast stainless steel in the [allegedly defective product]. As evidence not offered to prove the truth of the matter asserted, the deposition testimony was not subject to the general bar against hearsay and was properly admitted by the trial judge.").

9

At some point, Morrow assigned Adams to work in the kitchen, which Adams refers to as "working in the back", when Crestwood terminated another employee. (Warren Adams Dep. at 39, ll. 12–17; 40, l. 21; 46, l. 11). According to Morrow, "[w]hen the Food and Nutrition Services Department became short staffed, [he] needed [Adams] to work a different shift on certain days." (Doc. 26-3 at 3, ¶ 8). Adams testified the employee "was washing dishes and taking out trash in the back" before his termination. (*Id.* at 40, ll. 3–4). Thus, after the employee's termination, Adams commenced washing dishes in the kitchen and removing garbage from the kitchen. Morrow averred the "Food and Nutrition Services department relies on the Porters/Dishwashers to clean in the kitchen in order to keep the food preparation area clean and running smoothly." (Doc. 26-3 at 3, ¶ 5).

In addition to washing dishes and removing garbage from the kitchen, Morrow tasked Adams with delivering meal trays to hospital patients when he worked in the back. According to Morrow, Crestwood "rel[ies] on the Porters/Dishwashers to push meal carts to different hospital floors in order to distribute meals to Crestwood patients." (Doc. 26-3 at 3, ¶ 6). Morrow averred that distributing meals constitutes an "essential function[] that must be performed by the Porters/Dishwashers because Crestwood is an inpatient hospital and must be able to provide meals in compliance with health department standards to its patients, visitors, and staff." (*Id.*)

Adams testified that he used a "big cart" to deliver meal trays to patients on various hospital floors. (Warren Adams Dep. at 49, l. 1). Adams explained that

10

delivering the meal trays required him to read the patients' names and room numbers to ensure each patient received the correct tray. (*Id.* at 50, ll. 4–7). Adams testified that "some people [were] on diet[s]. You get the wrong name, [and] people get sick." (*Id.* at 50, 6–7). Adams testified, however, that because he does not read well, he "was giving people the wrong tray." (*Id.* at 50, l. 9). Adams averred he delivered the trays properly "[s]ometimes." (*Id.* at 50, l, 20).

According to Adams, he delivered "one [tray] every day" he worked at Crestwood, and improperly delivered "about 10" trays total during his employment. (*Id.* at 48, l. 23; 52, l. 8). Adams testified that no one demonstrated how to properly deliver the trays until he erred, though he "still got it wrong" after he received instruction. (*Id.* at 56, ll. 15–17). Adams did not inform anyone he did not understand how to properly deliver the trays. (*Id.* at 58, ll. 10–13).

Adams stated nurses and other personnel "would holler" at him "[a] whole lot" for delivering trays incorrectly. (*Id.* at 50, ll. 9–10; 54, l. 15). In his Declaration, Morrow averred Adams "was never disciplined for unsatisfactory performance or any other reason", and stated Adams "was able to handle all of the responsibilities of the Porter/Dishwasher role[,] and did so efficiently and effectively." (Doc. 26-3 at 3, ¶ 7).

Adams testified that he preferred working in the front, and that upon assuming the Porter/Dishwasher position, he "told [Morrow] [he] didn't want to work in the back." (*Id.* at 44, ll. 1–3). Adams stated his schedule changed when he worked in the

11

back, such that he could no longer take the bus to and from work as he did previously.[7] (*Id.* at 60, ll. 19–23; 61, l. 1).  Adams further explained that he preferred working in the front because he enjoyed "seeing the people."  (*Id.* at 46, ll. 18–19).  In addition, Adams testified that if Morrow had "just told [him] that . . . [he] [would] work in the back, it would have been all right with [him]."  (*Id.* at 93, ll. 4–6).

Adams elaborated:  "In [the] contract . . . [Morrow] hire[d] me to work in the front and do things in the front, that's what [Morrow] hired me for.  [He] didn't hire me to work in the back. . . . I don't mind working.  The application said I [am not] supposed to work in the back.  I worked in the front.  [M]y point is . . . [Morrow] hired me for in the front."  (*Id.* at 93, ll. 6–10, 18–22).  When asked if "the only reason [he] didn't want to work [in the back] was because [Morrow] had told [him] [he] [was] supposed to work in the front", Adams responded "[s]omething like that."  (*Id.* at 44, ll. 12–16).  Adams expressed he "wasn't happy" when Morrow tasked him to work in the back.  (*Id.* at 94, l. 7).  Adams further averred that by the end of his employment with Crestwood, he "hardly work[ed] in the front."  (Warren Adams Dep. at 55, l. 8).

Mrs. Adams offered the following testimony regarding Adams's circumstances at Crestwood:

> [W]hen [Adams] started, he was very happy.  Very happy with the hours.  He was very happy with the job duties.  He really loved communicating with the people out front, being able to talk to the nurses.

---

[7] Adams's time sheet reflects he frequently worked shifts commencing at approximately 11:00 a.m. and ending at approximately 8:00 p.m., though it remains unclear whether Adams always worked exclusively in the back during these shifts.

They commended him every day on his job out there in the cafeteria cleaning the tables.  He came home excited about how everybody said he was doing a great job.

Because [Adams] . . . didn't have a driver's license, we took the time to show him how to go back and forth to work on a bus by himself, and he was able to . . . gain independence by going back and forth to work and catching a bus.  Because of his hours, he was able to.  And he was very happy about that. So he went to work on his own; he took the bus. And he took the bus home by himself.  He really liked the job. He really liked what he was doing, working out there with the public.

. . .

I would say a few weeks into the job, Mr. Morrow increased his hours, increased his job duties, which caused [Adams] a lot of stress. When he increased his hours, [Adams] wasn't able to take the bus home anymore.  He was getting off at 8 o'clock, so I had to come and get him or get somebody to come and get him if I wasn't available. Sometimes he had to wait at least an hour for somebody to come get him.

People were quitting, and every time people quit, Mr. Morrow was giving [Adams] more job duties, more responsibilities. He was taking him away from his main job, which was working in the cafeteria cleaning the tables, and it caused a lot of stress and anxiety for [Adams]. . . .

. . .

He started working longer hours, getting off at 8 o'clock.  They had him working in the kitchen instead of out front. He was washing dishes, mopping floors. And then they had him take trays up to different floors to deliver them to the rooms or to the nurses['] stations.

. . .

[I]t got to the point where [Adams] was so upset, we . . . went to his doctor and [he] . . . either . . . increase[d] . . . his medication or . . . put him on . . . an additional [anxiety] medicine.   He [now] takes two medications for anxiety.

(Tosha Adams Dep. at 38–40, 55, ll. 5–11).

13

Mrs. Adams testified that Adams "didn't feel like it was fair that he was doing other people's job and not doing the job that he had [accepted]." (*Id.* at 51, ll. 19–21). Mrs. Adams further stated that "because [Adams] can't read, it was frustrating him trying to find his way to floors and find who the trays go to and where they come from." (*Id.* at 51, ll. 22–23; 52, ll. 1–2). Mrs. Adams averred Adams became "more agitated" at home after he commenced working in the back. She explained that Adams "was very argumentative . . . [and] very much stressed, which is why [he] had to . . . to get an increase in his medications." (*Id.* at 64, ll. 19–22).

Adams testified that he eventually spoke to Morrow about working in the back:

> I told [Morrow] that he didn't hire me for [the back].
>
> . . .
>
> [Morrow] just hired me in the front. That's what the application said. He said, ["]No, you got to go work in the back.["] I said, ["]No, you didn't tell me [to] work in the back when you hired me.["] I said, ["]You just told me work in the front.["] I would keep telling him to hire somebody to work in the back. He told me, ["]I'm going to hire somebody.["] . . . It[] [had] been a couple of months and he [had not] hired [any]body. I went in the office again and talked to him. I talked to [Morrow] about ten times. I said, ["Morrow], you got somebody?["] . . . He said ["]no["]. I said ["]you need to get somebody because you hired me in the front. You didn't hire me in the back.["]
>
> . . .
>
> We went on about 30 minutes. I said, . . . ["]All right. I'm going to give you a chance. I'm going work in the back for a little while. You better be hiring somebody because you hired me to work in the front.["]

(Warren Adams Dep. at 91, l. 23 – 93, ll. 1–4).[8]

Similarly, Mrs. Adams testified that after "trying to give Mr. Morrow a little time to find someone else," she spoke to Morrow about "put[ting] [Adams] back to what he was doing." (Tosha Adams Dep. at 45, ll. 7–8, 12–13).[9]  According to Mrs. Adams,

---

[8] Morrow's alleged statements represent statements by an opposing party and thus remain exempt from the definition of hearsay.  *See* Fed. R. Evid. 801(d)(2)(D) (A statement "offered against an opposing party [that] . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay.).  Morrow allegedly uttered the afore-cited statements to Adams as his supervisor and regarding his job duties.  Therefore, Morrow allegedly uttered the statements as Crestwood's agent or employee in the course of his employment.  *Id.*; *see Calvert v. Doe*, 648 F. App'x 925, 927 (11th Cir. 2016) ("Courts have admitted employee statements under Rule 801(d)(2)(D) where there is some evidence that the statements reflected some kind of participation in the employment decision or policy of the employer.") (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)); *Zaben v. Air Prods. & Chems.*, 129 F.3d 1455, 1456 (11th Cir. 1997) ("[S]tatements made by a supervisory official who plays some role in the decision making process are generally admissible" pursuant to Rule 801(d)(2)(D).); *Ewulonu v. Fulton County*, No. 1:10-CV-0945-WSD-GGB, 2011 U.S. Dist. LEXIS 165825, at *9 (N.D. Ga. June 17, 2011) ("The statements . . . are not hearsay because they were made in the course of employment by a manager with authority for management and employment decisions.") (citing *Zaben*, 129 F.3d at 1456).  Accordingly, the court may properly consider Morrow's alleged statements.

Similarly, the court may properly consider Adams's afore-cited statements as non-hearsay.  Adams's statements remain admissible not to prove the truth of the matter they assert, but rather to contextualize Morrow's alleged statements.  *See* Fed. R. Evid. 801(c)(2); *United States v. Price*, 792 F.2d 994, 996 (11th Cir. 1986) (Statements "offered to put into context [other] statements" do not constitute hearsay.).

[9] Mrs. Adams's statement portrays her request for an accommodation on Adams's behalf, which "triggered" Crestwood's "duty to provide a reasonable accommodation."  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."); *see* U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002) ("[A] family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability.").  Ms. Adams's statement thus constitutes a verbal act that retains independent legal significance, and, therewith, does not constitute hearsay.  *See United States v. Mena*, 863 F.2d 1522, 1531 (11th Cir. 1989) ("The portion of the document explicitly granting consent to board the [vessel] is not hearsay at all; but rather a verbal act, similar to the utterances involved in making a contract, to which the law attaches independent significance."); *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986) ("[E]xcluded from the hearsay rule is verbal or nonverbal 'conduct when it is offered as a basis for inferring something *other* than the

Morrow told her:  "I promise you we're going to get him back to what he was doing. We're going to get him back to his position.  I just need him now to fill in for the people that quit."  (*Id.* at 45, ll. 13–17).  Mrs. Adams replied to Morrow:  "[Adams] is threatening to quit because he doesn't want to do everybody's job, and he's getting frustrated because he's not able to bring the trays to the right floors, and the nurses are yelling at him."  (*Id.* at 45, ll. 22–23; 46, ll. 1–4).[10]

Mrs. Adams averred that when Adams continued "coming home threatening to quit every day", she "started calling the director of human resources", Mrs. Aleria Sinclair.  (*Id.* at 46, ll. 10–13).  On August 6, 2015, after Sinclair "never returned any of [her] calls", Mrs. Adams "went to Crestwood to see [Sinclair]."  (*Id.* at 47, ll. 1–2; doc. 32-1 at 7).  Mrs. Adams testified that Adams attended the meeting with Sinclair; however, Adams did not recall the meeting.  (*Id.* at 53, ll. 11–16; Warren Adams Dep. at 96, ll. 4–9).

Mrs. Adams recounted the meeting:

> I told [Sinclair] . . . that [Adams] is a special needs person, and he needs an accommodation because he is threatening to quit his job because he's being treated unfairly in the kitchen. I said ["]Mr. Morrow is giving

---

matter asserted.' Consequently, an utterance may be admitted to show the effect it has on a hearer. Such verbal acts are not in the first instance assertive statements and not offered to prove the truth of the matter asserted.") (emphasis in original) (internal citations omitted); 31A C.J.S. Evidence § 477 ("The 'verbal act' doctrine permits the admission of out-of-court unsworn statements or declarations in evidence for the purpose of showing that the words have been said by the declarant, as when the statement is an operative fact that gives rise to legal consequences or is a circumstance bearing on conduct affecting the parties' rights; verbal acts are not hearsay.").

[10] The court may consider Ms. Adams's statement to Morrow as non-hearsay because it contextualizes her afore-cited accommodation request.  *See Price*, 792 F.2d at 996.

him more and more responsibilities and duties, and he can't handle it.  And it's not fair that he will not work with me on getting [Adams] back to doing his original job.["]  I said that Mr. Morrow wasn't willing to cooperate with me.

. . .

I told her everything about [Adams].  I told her that I was previously a job coach.  And I said that I know that [Adams] has a disability, and he needs an accommodation.  And I said that [] Morrow was violating his rights because he was not willing to work with me on trying to make sure [Adams] stayed in his job.  I said that [Morrow] just has [Adams] doing all kinds of things that was out of his scope of his work performance.  And she listened to me, and she rolled her eyes.

. . .

[Morrow] came in and he was saying, ["]I told [Adams] if he's not happy with the job to just quit.["]  [Morrow] told him ["]just quit.  You know, he do[es] [not] have to stay with us.["]

And I said ["]that's not what we're saying.["]  I said ["]I am requesting an ADA accommodation because he has a learning disability and he needs assistance.["]  And . . . [Sinclair's] exact words were, ["]well, my first priority are the patients at this hospital.["]

. . .

[Sinclair] said a lot.  But it was pretty much there was nothing [they] were going to go.  I'm sorry, there's nothing we can help you with.  There's nothing – you know, [Adams] either does it or he needs to quit.

(Tosha Adams Dep. at 48, ll. 4–14; 49, ll. 12–23; 52, ll. 21–23; 53, ll. 1–9, 12–16).[11]

---

[11] Mrs. Adams's statements portray a request for an accommodation, and contextualize Morrow's and Sinclair's alleged statements.  The court may therefore properly consider Mrs. Adams's statements as non-hearsay.  *See Mena*, 863 F.2d at 1531; *Cruz*, 805 F.2d at 1478; *Price*, 792 F.2d at 996.  The court may consider Morrow's and Sinclair's statements as non-hearsay, party-opponent statements pursuant to Rule 801(d)(2)(D).  *See Calvert*, 648 F. App'x at 927; *Zaben*, 129 F.3d at 1456; *Ewulonu*, 2011 U.S. Dist. LEXIS 165825, at *9.

Mrs. Adams clarified the accommodation she requested would have entailed Adams "go[ing] back to the same hours he was hired with and go[ing] back to just working in the cafeteria cleaning the tables and taking out the trash, what he was hired to do." (*Id.* at 53, ll. 20–23; 54, l. 1). Mrs. Adams testified that Adams required an accommodation vis-à-vis his schedule "[b]ecause he lost his independence." (*Id.* at 54, l. 5). Mrs. Adams elaborated that when Adams worked in the front, "[h]e was able to take the bus to work and back, and that was almost as enjoyable to him as the job because he was able to feel like he was handling things by himself. He was very proud of himself that he was able to do that by himself." (*Id.* at ll. 6–11). Mrs. Adams testified that she "always took" Adams to work when he could not take the bus, and that he never missed a shift due to transportation issues. (*Id.* at 71, ll. 6–10). Nevertheless, Adams preferred to take the bus to and from work. (*Id.* at ll. 11–12).

Mrs. Adams further clarified she told Sinclair that Adams's disabilities consisted of a "learning disability, intellectual disability." (*Id.* at 50, ll. 2–3). Mrs. Adams elaborated:

> I always say that [Adams] has a learning disability and intellectual disability. I always tell them that he cannot read. And I'm not sure if [Sinclair] knew it because she's the director, but the other people in human resources knew it because they provided me with the paperwork when [Adams] started [at Crestwood], and I had to fill it all out. They provided me with a test when he started, with a booklet, and I had to do the whole thing.

(*Id.* at 50, ll. 4–14).[12]

---

[12] Mrs. Adams's statements elaborate and contextualize her request for an accommodation, and thus

After her August 6, 2015, meeting with Sinclair, Mrs. Adams emailed Dr. Pam Hudson, Crestwood's Chief Executive Officer, to express concern for "the way [she] was treated by Mrs. Sinclair." (Doc. 32-1 at 7). Mrs. Adams's email further stated she believed Adams's "treat[ment] in his position in the cafeteria . . . violated his rights as a person with a mental disability." (*Id.*) Mrs. Adams wrote that Sinclair "repeatedly said there [was] nothing she [could] do" for Adams, even though "[a]ll [the Adamses] requested was to have [Adams] stay in the job he was hired to do, not fill in and do the work of 3 people." (*Id.*) Mrs. Adams added: "[Adams] is a hard worker and he is being taken advantage of." (*Id.*) Later that evening, Dr. Hudson replied: "Thank you for making me aware of your concerns. I will look into this tomorrow." (*Id.* at 8).[13]

Mrs. Adams emailed Dr. Hudson again on September 8, 2015:

> I am coming to you because our problem has escalated to where [Adams] is looking to quit. Due to Mrs. Sinclair being unwilling and unable to assist us, is there anything you can do or someone to refer us to? Mr.[] Morrow continues to have [Adams] work hours that he was not scheduled to work and complete duties other than what he was hired to do, because he is short on workers. He told us a few weeks ago[] he hired someone and [Adams] will only have to do other jobs until that person gets in. Well its [sic] been a month, and he is still requiring [Adams] to work other hours even though the schedule says 9[:]30 am to 3pm. Again, [Adams] has a

---

do not constitute hearsay. Therefore, the court may properly consider Mrs. Adams's statements. *See Mena*, 863 F.2d at 1531; *Cruz*, 805 F.2d at 1478; *Price*, 792 F.2d at 996.

[13] Mrs. Adams's statements depict her request for an accommodation and contextualize her prior interaction with Sinclair. Therefore, the court may properly consider Mrs. Adams's statements as non-hearsay. *See Mena*, 863 F.2d at 1531; *Cruz*, 805 F.2d at 1478; *Price*, 792 F.2d at 996. The court may properly consider Dr. Hudson's statements as non-hearsay, party-opponent statements pursuant to Rule 801(d)(2)(D). *See Calvert*, 648 F. App'x at 927; *Zaben*, 129 F.3d at 1456; *Ewulonu*, 2011 U.S. Dist. LEXIS 165825, at *9.

disability and his needs are very simple to stay in his job.  He is being harassed to and encouraged to quit because of his disability.

(*Id.*)  Dr. Hudson replied:  "Thank you for your email.  Our employees should reach out to our Director of Human Resources if they have any concerns."  (*Id.*)[14]

Adams eventually resigned from his Porter/Dishwasher position.  (Doc. 26-1 at 61, ¶ 21).  Adams testified Morrow "made [him] quit" because Morrow "hollered at [him] . . . like [he] [was not a] human being" and said "[a]ll kinds of stuff."  (Warren Adams Dep. at 59, ll. 20–23; 67, ll. 16, 18–23).   Adams suggested that Morrow "hollered" at him to quit his weekend job so that Adams could work at Crestwood on the weekends.[15]  (Warren Adams Dep. at 68, ll. 16–18).  Adams also testified he "loved Crestwood" and "didn't want to quit."  (*Id.* at 67, ll. 11–12).  Likewise, Adams testified "[e]verybody loved [him]" and "[t]hey didn't want [him] to quit."  (*Id.* at 45, ll. 15–16).  In his Declaration, Morrow averred Adams "was one of [his] best workers and [he] believed [Adams] was able to perform all of [his] responsibilities."  (Doc. 26-3 at 4, ¶

---

[14] Mrs. Adams's statements depict her additional request for an accommodation.  Therefore, the court may properly consider Mrs. Adams's statements as non-hearsay.  *See Mena*, 863 F.2d at 1531; *Cruz*, 805 F.2d at 1478.  The court may properly consider Morrow's alleged statement as a non-hearsay, party-opponent statement pursuant to Rule 801(d)(2)(D).  *See Calvert*, 648 F. App'x at 927; *Zaben*, 129 F.3d at 1456; *Enulonu*, 2011 U.S. Dist. LEXIS 165825, at *9.

[15] When questioned whether Adams resigned from Crestwood because Morrow asked him to quit his weekend job, Adams initially responded "No."  (Warren Adams Dep. at 67, l. 10).  However, when Adams proceeded to explain why Morrow "made [him] quit", and how Morrow spoke to him "like [he was not a] human being", Adams recounted that Morrow "hollered" at him to "quit [his] job on the weekend."  (*Id.* at 67, ll. 14–20; 68, ll. 15–16).

10).    Adams's time sheet reflects his final shift occurred on September 14, 2015.  (Doc. 26-1 at 50).

Adams testified his disabilities include "reading and writing."  (Warren Adams Dep. at 88, l. 17).   Adams averred he does not read "that good" and he has "no education."  (*Id.* at 88, ll. 10–11).  Adams stated he knows how to "fill out [his] name and stuff like that", but "[w]hen it gets to . . . big words, [he] can't do it."  (*Id.* at 88, ll. 11–14).  Adams averred he can read numbers.  (*Id.* at 50, l. 16).  In addition, Adams testified Dr. Zia Hassan diagnosed him with "[d]epression and anxiety," yet he does not recall when he received this diagnosis.  (*Id.* at 102, ll. 15, 22).

Dr. Hassan's records indicate he began treating Adams for anxiety and various physical infirmities in April 2019.  (Doc. 26-4 at 8–53).  In medical records dated April 1, 2019, Dr. Hassan notes Adams "was evaluated by a psychologist about 3 years and was diagnosed with [an] intellectual disability"; Adams needed "a form completed for his work saying that he needs advocacy for his needs at work"; and Adams "washes dishes at work." (*Id.* at 8). During the same visit, Dr. Hassan noted as "PROBLEM # 1" that Adams has an "INTELLECTUAL DISABILITY, MODERATE"; Dr. Hassan completed the afore-referenced work form; and Dr. Hassan remarked, "I do believe that he needs advocacy as he is unable to comprehend complicated issues/tasks." (*Id.*

21

at 11).[16] Dr. Hassan continued to note Adams's intellectual disability in subsequent treatment visits.

Adams averred that he becomes anxious "when people holler at [him]." (Warren Adams Dep. at 97, l. 9). Adams explained that he loses focus and "get[s] frustrated when somebody hollers at [him]." (*Id.* at 97, ll. 9–12). Adams testified: "I can't read. I can't hardly do nothing. . . . People call me stupid and dumb, don't know how to read. . . . When I was in high school . . . [people] pick[ed] with me and call[ed] me dumb and didn't know how to drive, didn't know how to do nothing. Now when somebody hollers at me, I go somewhere else. Move and go somewhere else." (*Id.* at 97, ll. 18-23; 98, ll. 1–8). Adams stated he did not tell anyone at Crestwood he experienced anxiety, and no one told him they believed he experienced anxiety. (*Id.* at 100, ll. 15–

---

[16] Dr. Hassan's medical records stand excepted from the hearsay rule as business records pursuant to Rule 803(6), provided the proponent properly certifies the records or the parties stipulate to their authenticity at trial. *See* Fed. R. Evid. 803(6) ("A record of an act, event, *condition, opinion, or diagnosis* [is not excluded by the rule against hearsay] if: (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the opponent does not show that the source of information nor or the method or circumstances of preparation indicate a lack of trustworthiness.") (emphasis added); *Shea v. Royal Enters., Inc.*, No. 09 CIV. 8709 THK, 2011 WL 2436709, at *11 (S.D.N.Y. June 16, 2011) ("'Medical records . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated.'") (quoting *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y.1995)) (citing *United States v. Sackett*, 598 F.2d 739, 742-43 (2d Cir. 1979) (holding that hospital records as admissible if they "were kept in the course of the regularly conducted business activity of the hospital")). Of course, any statements by the Adamses in the medical record stand excepted from the hearsay rule as statements made for medical diagnosis or treatment pursuant to Federal Rule of Evidence 803(4).

22).   However, Adams testified the "people [he] work[ed] with kn[ew] [he] had problems." (*Id.* at 99, ll. 8–9).  Adams specified he is "kind of slow", and his problems involve difficulties reading and articulating his words.  (*Id.* at 99, ll. 12–13).

Mrs. Adams testified that in or around 2016, a psychiatrist diagnosed Adams with an intellectual disability "and maybe a couple more different things like an anxiety disorder or something." (Tosha Adams Dep. at 59, ll. 1–19; 63, ll. 13–14).  Mrs. Adams stated Adams "probably" has an "anxiety disorder" and other mental disabilities; though, she does not recall such other disabilities.  Mrs. Adams averred she did not take Adams to a psychiatrist before or during his employment with Crestwood.  (*Id.* at 59, ll. 22–23).  In addition, when asked when she learned Adams had a learning disability, she responded: "[o]n . . . the first night [we met], because he couldn't write down my phone number. . . . he couldn't give me his phone number because he didn't know it." (Tosha Adams Dep. at 62, ll. 2–8).  According to Mrs. Adams, a certified registered nurse practitioner treated Adams for anxiety during his employment at Crestwood.  (*Id.* at 55, ll. 13–22).

Further, Mrs. Adams stated she believed Adams's disability is

very obvious . . . [b]ecause he's not able to understand a lot of things that people say.  He's not able to read.  He's not able to tell time.  He doesn't know direction.  He doesn't even know his ABCs.  He can't count probably to 30. . . . He didn't get a high school diploma.  They gave him a certificate.  He was in special education.

(*Id.* at 60, ll. 2–3, 17–22; 61, ll. 2–4).

In his Declaration, Morrow averred the Adamses "informed [him] that [Adams] did not prefer to work other than from approximately 9 am to 3 pm because that schedule was more convenient for them[,] . . . but they never informed [him] that he had any schedule restrictions based on a disability." (Doc. 26-3 at 4, ¶ 8). Morrow further declared that "[a]lthough Mr. Adams needed reading and writing assistance during the application and onboarding process, [neither] Mr. Adams nor [Mrs. Adams] ever informed me that he had anxiety or a mental disability." (*Id.* at 4, ¶ 10). Morrow further averred he "never perceived Adams as having a disability." (*Id.*)

On September 1, 2015, Adams filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Doc. 26-1 at 56). In his Charge, Adams alleged he is "an individual with disabilities" and Crestwood discriminated against him on the basis of his disabilities. (*Id.*) The EEOC concluded "there is reasonable cause to believe that [Crestwood] discharged [Adams] from his job after he revealed his medical condition." (Doc. 32-1 at 5). The EEOC issued a Notice of Right to Sue on June 14, 2018. (Doc. 1-1 at 1). Adams initiated this suit on September 6, 2018. (Doc. 1).[17]

---

[17] Adams emphasizes that "[t]he EEOC investigated this case and determined that there was reason[] to believe discrimination occurred." (Doc. 31 at 13). The EEOC's finding, Adams maintains, "suggests that [Adams] faced disability discrimination." (Doc. 31 at 13). However, as Crestwood properly highlights, "[t]he district court is not required to defer to the EEOC determination, and it must conduct a de novo review of the claims." (Doc. 33 at 12). The Eleventh Circuit ruled that notwithstanding the EEOC's investigatory and enforcement authority, the "final responsibility for enforcement of the federal employment discrimination laws is vested in the federal courts." *Walker v. NationsBank N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995). Thus, "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of

In his Complaint, Adams alleges Crestwood discriminated against him on the basis of his disabilities by failing to reasonably accommodate his limitations.  (*Id.* ¶ 22). Adams alleges he "is disabled by way of anxiety and a mental disability that substantially limits one of more of his major life activities; in particular, his ability to work."  (*Id.* ¶ 5).   In addition, Adams alleges he "has a history of having an impairment, which substantially limits one or more of his major life activities, and/or [Crestwood] perceived [him] as a person with a disability."  (*Id.*)

Further, Adams avers Crestwood assigned him "duties outside of his job classification with longer hours."  (*Id.* ¶ 10).  The Complaint alleges that due to the "[n]ew schedule changes", "it became difficult for Adams to get to work . . . [and] [h]e was no longer able to take the bus."  (*Id.* ¶¶ 11–12).  Adams also alleges delivering meal trays "was very difficult", as he "would get lost trying to find his way back and forth throughout the hospital [after] altering his normal path."  (*Id.* ¶ 14).   Adams avers "[t]hese sudden changes impacted his well-being and increased his independence[,][18] which triggered more anxiety."  (*Id.* ¶ 17).  In addition, Adams alleges that "[w]hen [he]

<hr/>

determination does not create one."  *Drakeford v. Ala. Coop. Extension Sys.*, 416 F. Supp. 2d 1286, 1312 (M.D. Ala. 2006) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1331 (10th Cir. 1999)).  Further, the court retains no duty to refer to a favorable EEOC determination in conducting the summary judgment assessment.  *See Kincaid v. Bd. of Trs.*, 188 F. App'x 810, 817 (11th Cir. 2006) ("[T]he magistrate judge was not required to defer or make reference to the EEOC determination; the magistrate judge had to conduct a de novo review of the claims.").

[18] Given the Ms. Adams's afore-cited testimony regarding Adams's independence, the court presumes Adams intended to aver the sudden changes "*decreased* his independence" or "increased his *dependence*."

was hired, [Mrs. Adams] advised [Crestwood] of his disability; however, he was not accommodated as was the original plan." (*Id.* ¶ 20).

## ANALYSIS

The ADA forbids covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As relevant here, § 12112 further provides that an employer discriminates against an individual on the basis of a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

A modified *McDonnell Douglas* burden-shifting framework applies to ADA claims founded upon circumstantial evidence.[19] *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Therefore, the plaintiff bears the initial burden of proving a *prima facie* case of disability discrimination, which requires a demonstration that he: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against on the basis of

---

[19] Adams does not dispute "there is no direct evidence of discrimination" in this case. (Doc. 25 at 9).

his disability. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11ᵗʰ Cir. 2019) (citations omitted).[20]

Crestwood contends that Adams cannot establish the following components of his prima facie case: one, that he manifests an impairment constituting a disability pursuant to the ADA; two, that he could perform the essential functions of his position so as to render him a qualified individual with a disability; and three, that Adams's request for accommodations was not reasonable.  Therefore, the threshold issue posits whether Adams was disabled pursuant to the ADA's standards, as amended.

The Regulations clarify that "'[s]ubstantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  Thus, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  *Id.* § 1630.2(j)(1)(ii).  To determine whether the plaintiff's impairment substantially limits a major life activity, the court should engage in an "individualized assessment" that considers the plaintiff's ability "to perform a major life activity as compared to most people in the general population."  *Id.*

---

[20] As reflected in the current version of 42 U.S.C. § 12112(a)(1), the ADA Amendments Act of 2008 struck the wording "with a disability because of the disability of such individual" and replaced them with "on the basis of disability."  Pub. L. 110–325, §5, 122 Stat. 3553.

# I.   A GENUINE ISSUE OF MATERIAL FACTS EXISTS AS TO WHETHER ADAMS MANIFESTS AN INTELLECTUAL DISABILITY

The court notes, as an initial matter, an ambiguity vis-à-vis Adams's alleged impairments.  To recount, Adams avers in his Complaint he "is disabled by way of . . . a mental disability."  (Doc. 1-1 ¶ 5).  In his response to Crestwood's Motion, Adams specifies his inability to recite the alphabet and tell time, as well as his "difficulty understanding what people say to him", constitute impairments that "significantly impact his ability to learn and work."  (Doc. 31 at 10).

Adams's response further references a learning impairment and an intellectual impairment:  "Mrs. Adams . . . inform[ed] multiple hospital officials about [Adams's] intellectual disability, including when she appeared with him at his initial job interview and hiring. At the outset Mrs. Adams alerted Morrow that [Adams] had a learning disability . . . ."  (*Id.*)  Similarly, Adams's response states that "[o]n their first meeting Mrs. Adams knew [Adams] had an intellectual disability."  (*Id.* at 3).  However, the response proceeds to quote Mrs. Adams's testimony regarding her initial perception of Adams's alleged learning impairment.  (*Id.*)  Furthermore, whereas Mrs. Adams testified Adams "has a learning disability and intellectual disability," (Tosha Adams Dep. at 50, ll. 4–6), Adams testified his disabilities exclusively comprise difficulties "reading and writing."  (Warren Adams Dep. at 88, ll. 10–19).[21]

---

[21] To the extent Adams contends that his illiteracy is a disability, prevailing law precludes such a finding. *See Morisky v. Broward County*, 80 F.3d 445, 448-49 (11th Cir. 1996) (per curiam). *Morisky*

The foregoing representations suggest the Adamses refer to the intellectual and learning impairments interchangeably.  Yet a learning impairment constitutes a distinct impairment from an intellectual impairment, and one does not necessarily entail or subsume the other.  *See Laboriel v. Saul*, No. 18-CV-5294 (KPF) (OTW), 2019 U.S. Dist. LEXIS 143884, at *21 n.6 (S.D.N.Y. Aug. 22, 2019) ("[A] learning [disability] is different from an intellectual disability."); *United States v. Lewis*, No. 1:08 CR 404, 2010 U.S. Dist. LEXIS 138375, at *94–95 (N.D. Ohio Dec. 23, 2010) ("[A] learning disability is a subject specific disorder and can be distinguished from an intellectual disability that exhibits 'general impairment in intellectual functioning.' . . . [A] learning disability is distinguished from intellectual disability because a learning disabled individual will have a discrepancy between his or her IQ and academic performance. Conversely, an intellectually disabled individual will have a subaverage IQ that is consistent with his or her academic performance.") (citations omitted) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISION 15 (4ᵗʰ ed. 2000).[22]

---

established that "illiteracy is not a disability (i.e., a mental impairment) in itself," though it "may result from a disability." *Macleroy v. City of Childersburg*, No. 1:18-CV-395-CLM, 2020 U.S. Dist. LEXIS 62252, at *18 (N.D. Ala. Apr. 9, 2020) (pursuant to *Morisky*, the plaintiff's illiteracy – which he conceded arose solely from his lack of education – did not constitute an ADA-recognized disability).  As the EEOC highlights, "[e]nvironmental, cultural, or economic disadvantages such as poverty [or] lack of education," which may engender illiteracy, "are not impairments."  29 C.F.R. Part 1630, App. § 1630.2(h).

[22] The Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") defines an intellectual disability as follows:

Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such a reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (5th ed. 2013).

Contrastingly, the DSM-5 specifies that to assess an individual with a learning disability, the following "four diagnostic criteria are to be met based on a clinical synthesis of the individual's history":

A. Difficulties learning and using academic skills, as indicated by the presence of at least one of the following symptoms that have persisted for at least 6 months, despite the provision of interventions that target those difficulties:

1. Inaccurate to slow and effortful word reading (e.g., reads single words aloud incorrectly or slowly and hesitantly, frequently guesses words, has difficulty sounding out words).

2. Difficulty understanding the meaning of what is read (e.g., may read text accurately but not understand the sequence, relationships, inferences, or deeper meanings of what is read).

3. Difficulties with spelling (e.g., may add, omit, or substitute vowels or consonants).

4. Difficulties with written expression (e.g., makes multiple grammatical or punctuation errors within sentences; employs poor paragraph organization; written expression of ideas lacks clarity).

5. Difficulties mastering number sense, number facts, or calculation (e.g., has poor understanding of numbers, their magnitude, and relationships; counts on fingers to add single-digit numbers instead of recalling the math fact as peers do; gets lost in the midst of arithmetic computation and may switch procedures).

6. Difficulties with mathematical reasoning (e.g., has severe difficulty applying mathematical concepts, facts, or procedures to solve quantitative problems).

B. The affected academic skills are substantially and quantifiably below those expected for the individual's chronological age, and cause significant interference with academic or occupational performance, or with activities of daily living, as confirmed by

The ADA regulations clarify that a litigant must identify a specific learning disability, 29 C.F.R. § 1630.2(h)(2), thus precluding reliance upon a general diagnosis of a learning impairment.[23]  Adams has not identified a specific learning impairment on

---

individually administered standardized achievement measures and comprehensive clinical assessment.  For individuals age 17 years and older, a documented history of impairment learning difficulties may be substituted for the standardized assessment.
C. The learning difficulties begin during school-age years but may not become fully manifest until the demands for those affected academic skills exceed the individual's limited capacities (e.g., as in timed tests, reading or writing lengthy complex reports for a right deadline, excessively heavy academic loads).
D. The learning difficulties are not better accounted for by intellectual disabilities, uncorrected visual or auditory acuity, other mental or neurological disorders, psychosocial adversity, lack of proficiency in the language of academic instruction, or inadequate educational instruction.

*Id.* at 66–67.

Pursuant to Federal Rule of Evidence 201(c)(1), the court takes judicial notice of the DSM-5's intellectual disability and learning disability definitions.  *See Harris v. H & W Contr. Co.*, 102 F.3d 516, 522 (11ᵗʰ Cir. 1996) (Based upon various medical texts, the Court judicially noticed "that Graves' disease is a condition that is capable of substantially limiting major life activities if left untreated by medication."); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").  The DSM "is generally considered the accepted authority on mental health diagnosis."  13 ROSCOE N. GRAY & LOUISE J. GORDY, ATTORNEYS' TEXTBOOK OF MEDICINE § 112.04 (3d ed. 2020).  Based upon the DSM's authority, the court concludes the accuracy of its intellectual disability and learning disability definitions "cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  Therefore, the court may judicially notice the afore-cited intellectual disability and learning disability definitions.

[23] As one treatise elaborates:

The term "specific learning disabilities" has a precise meaning as defined in the Education of the Handicapped Act:

The term "children with specific learning disabilities" means those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain disfunction, dyslexia, and developmental aphasia. The term does not include children who have learning problems that are primarily the result of visual,

the record or in briefing.  Therefore, Adams posits an intellectual impairment as the underlying basis for his disability claim.  The court will assess whether a genuine issue of material fact exists as to Adams's alleged intellectual impairment as a disability.

> ### A.   A Reasonable Juror May Conclude Adams's Alleged Intellectual Disability Constitutes an Impairment that Substantially Limits One or More of His Major Life Activities

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Therefore, as to the first prong, the court must determine whether a genuine issue of fact persists regarding Adams's contention that he has an actual disability.  *Lewis*, 934 F.3d at 1179; 29 C.F.R. § 1630.2(g).

As provided in the ADA Amendments Act of 2008 (ADAAA), "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and "the question of whether an individual's impairment is a disability under the ADA should not demand extensive

---

hearing, or motor handicaps, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

20 U.S.C. § 1401(a)(15).

The term "specific learning disability" in the ADA should be construed consistently with the definition of the term provided by Congress in the Individuals with Disabilities Education Act, formerly known as Education of the Handicapped Act. *Argen v. New York State Bd. of Law Exam'rs*, 860 F. Supp. 84 (W.D.N.Y. 1994).

1 ADA: Employee Rights § 3.02 (2020).

analysis . . . ." 42 U.S.C. § 12101 note.  As the Eleventh Circuit acknowledged, "Congress intended 'that the establishment of coverage under the ADA should not be overly complex nor difficult, and expect[ed] that the [ADAAA] will lessen the standard of establishing whether an individual has a disability for purposes of coverage under the ADA.'" *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 n.2 (11ᵗʰ Cir. 2014) (quoting H.R. Rep. No. 110–730, at 9 (2008)) (alterations in original).

1.  <u>A Genuine Issue of Material Fact Exists as to Whether Adams Manifests an Intellectual Disability as an Impairment</u>

As outlined, the determination whether Adams has a disability begins with the issue whether he has an impairment.  Pursuant to the ADAAA, the EEOC has promulgated regulations on this assessment which may carry the force of law.  *See* 42 U.S.C. § 12205a ("The authority to issue regulations granted to the [EEOC] . . . under this chapter includes the authority to issue regulations implementing the definitions of disability in section 12102 of this title (including rules of construction) and the definitions in section 12103 of this title, consistent with the ADA Amendments Act of 2008.").[24]  Therewith, the regulations expressly provide that a physical or mental

---

[24] An agency regulation may constitute

a "legislative rule," which is "'issued by an agency pursuant to statutory authority'" and has the "'force and effect of law[.]' "[] *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979) (quoting *Batterton v. Francis*, 432 U.S. 416, 425, n.9 (1977)). Or [it may constitute] an "interpretive rule," which simply "'advis[es] the public of the agency's construction of the statutes and rules which it administers'" and lacks "'the force and effect of law[.]'"[] *Perez v. Mortgage Bankers Assn.*, 575 U. S. 92, --, (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)).

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019) (fourth alteration in original).

Thus, "a substantive or legislative-type rule i[s] one 'affecting individual obligations,' *Morton v. Ruiz*, 415 U.S. 199, 232 (1971), which has been issued by the agency pursuant to statutory authority and promulgated in accordance with the procedural requirements of the Administrative Procedure Act. *Chrysler Corp. v. Brown*, 441 U.S. at 302-303." *United States v. Harvey*, 659 F.2d 62, 64 (5th Cir. Unit B 1981); *see also Chrysler Corp.*, 441 U.S. at 302 (In *Morton v. Ruiz*, *supra*, the Court "noted a characteristic inherent in the concept of a 'substantive rule.' [It] described a substantive rule -- or a 'legislative-type rule,' -- as one 'affecting individual rights and obligations.'") (citation omitted).

As further guidance for the delineation of substantive rules, the Supreme Court gives "some weight to the Attorney General's Manual on the Administrative Procedure Act (1947)," which "refers to substantive rules as rules that 'implement' the statute." *Chrysler Corp.*, 441 U.S. at 302 n.31. This description also encompasses the statutory authority accorded by Congress for an agency to establish legislative rules. *See id.* at 302 ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes.").

As countenanced previously, legislative rules "must conform with any procedural requirements imposed by Congress." *Id.* at 303. The Court prescribes the necessary procedure as follows:

> Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for so-called "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. § 553(b). Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). An agency must consider and respond to significant comments received during the period for public comment. See *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (C.A.D.C.1984). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." § 553(c). Rules issued through the notice-and-comment process are often referred to as "legislative rules" because they have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979) (internal quotation marks omitted).

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

There should be no dispute the pertinent EEOC regulations implementing the ADAAA constitute legislative rules carrying the force and effect of law. Congress gave statutory authority for the EEOC to promulgate the regulations as to pertinent definitions in the ADA legal regime. *See* 42 U.S.C. § 12205a ("The authority to issue regulations granted to the [EEOC] . . . under this chapter includes the authority to issue regulations implementing the definitions of disability in section 12102 of this title (including rules of construction) and the definitions in section 12103 of this title, consistent with the ADA Amendments Act of 2008."). Furthermore, the regulations affect the individual rights and obligations of litigants as to those definitions.

Finally, the regulations proceeded through the appropriate procedure.  On September 23, 2009, the EEOC published for notice and public comment proposed regulations implementing the ADAAA. 74 Fed. Reg. 48,431 (Sept. 23, 2009).  There ensued an extended comment period, after which the EEOC published final regulations on March 25, 2011, which became effective May 24, 2011. 76 Fed. Reg. 16,978 (Mar. 25, 2011).  The final regulations include a concise, general statement of their basis and purpose:

> The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 C.F.R. § 1630.1(c)(4).

Therefore, it appears that the EEOC regulations defining pertinent terms have the force and effect of law. *See Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 257 n.6 (3d Cir. 2020) ("In 42 U.S.C. §§ 12186(b) and 12205a, the ADA authorizes DOJ to issue regulations implementing the public accommodations provisions of the ADA. Such regulations have 'the force and effect of law.'") (quoting *PDR Network*, 139 S. Ct. at 2055); *Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 309 n.9 (D.D.C. 2015) ("In enacting the ADAAA, Congress expressly delegated authority to the EEOC to issue regulations implementing the definition of disability under the ADA. 42 U.S.C. § 12205a. Accordingly, the Court must give the EEOC regulations 'controlling weight.'") (quoting *Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)); *Floyd v. Lee*, 85 F. Supp. 3d 482, 500 n.24 (D.D.C. 2015) ("Before the ADAA, the level of deference warranted by EEOC regulations interpreting 'disability' was an open question, given that the ADA did not expressly delegate interpretive authority to that agency. . . . But in the ADAA, Congress expressly delegated to the EEOC 'the authority to issue regulations implementing the definitions of disability in [42 U.S.C. §] 12102.' 42 U.S.C. § 12205a. The Court thus gives the EEOC regulations 'controlling weight.'") (quoting *Chevron*, 467 U.S. at 844 (1984) (citations omitted); *Morris v. BNSF Ry. Co.*, No. 8:13CV24, 2014 WL 6612604, at *2 n.5 (D. Neb. Nov. 20, 2014), *aff'd*, 817 F.3d 1104 (8th Cir. 2016) ("Because the EEOC has been granted "the authority to issue regulations implementing the definition of disability in section 12102, 42 U.S.C. § 12205a, this definition must be given a high degree of deference.") (citing *Fenney v. Dakota, Minnesota & E. R. Co.*, 327 F.3d 707, 713-14 & n.10 (8th Cir. 2003) (noting that amount of deference given to EEOC regulations was an 'open question' prior to passage of the ADAAA )); *Estate of Murray v. UHS of Fairmount, Inc.*, No. CIV.A. 10-2561, 2011 WL 5449364, at *6 n.15 (E.D. Pa. Nov. 10, 2011) ("In a pre-ADAAA case, the Third Circuit found that EEOC regulations interpreting the ADA were entitled to Chevron deference. *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 515 n.8 (3d Cir.2001). The Court sees no reason why that holding would change post-ADAAA given that the Act specifically gives the EEOC authority to issue regulations to implement the Act's definitions of disability.") (citing 42 U.S.C. § 12205a); Teressa L. Elliott, J.D., *The Path to the Americans with Disabilities Act Amendments Act: U.S. Supreme Court Cases, Congressional Intent, and Substantial Change*, 48 Gonz. L. Rev. 395, 420

impairment encompasses any "mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation') . . . ." 29 C.F.R. § 1630.2(h)(2). Thus, an intellectual disability constitutes an impairment under the ADA, yet the issue ensues whether Adams manifested such a disability. Based upon the genuine issues of material fact on this question, a reasonable jury may conclude he does.

First, the most concrete evidence of Adams's intellectual disability arises from the references to his diagnosis in the record. As reviewed in the Background, Adams's primary care physician, Dr. Zia Hassan, notes in medical records dated April 1, 2019, that Adams "was evaluated by a psychologist about 3 years and was diagnosed with [an] intellectual disability"; Adams needed "a form completed for his work saying that he needs advocacy for his needs at work"; and Adams "washes dishes at work." (Doc. 23-4 at 8). During the same visit, Dr. Hassan noted as "PROBLEM # 1" that Adams has

---

(2012) (The "EEOC now has authority to issue binding regulations. These regulations must, however, be consistent with the expansiveness of the ADAAA. Furthermore, 'Congress vested the EEOC with authority to define 'substantially limits' in response to Supreme Court cases questioning whether the EEOC had authority under 'generally applicable provisions of the [[original] ADA' to issue regulations defining 'disability' and 'major life activities.'") (footnotes and citations omitted); Carol J. Miller, *EEOC Reinforces Broad Interpretation of ADAAA Disability Qualification: But What Does "Substantially Limits" Mean?*, 76 Mo. L. Rev. 43, 49 (2011) ("The ADAAA expressly delegates authority to the EEOC . . . to create regulations consistent with these amendments, and most importantly, to implement ADA sections 12102 and 12103. Congress vested the EEOC with authority to define 'substantially limits' in response to Supreme Court cases questioning whether the EEOC had authority under 'generally applicable provisions of the [original] ADA' to issue regulations defining 'disability' and 'major life activities.' The original 1990 ADA enabling legislation did not contain such a specific directive.") (citations and footnotes omitted); Hillary K. Valderrama, *Is the ADAAA "Quick Fix" or Are We Out of the Frying Pan and into the Fire?: How Requiring Parties to Participate in the Interactive Process Can Effect Congressional Intent Under the ADAAA*, 47 Hous. L. Rev. 175, 201 (2010) ("There are other important changes as well [wrought by the ADAAA]. Chief among them is a clear grant of regulatory authority to the enforcement agencies, which extends to the definition of disability and rules of construction.") (footnote omitted) (citing 42 U.S.C. § 12205a).

an "INTELLECTUAL DISABILITY, MODERATE"; Dr. Hassan completed the afore-referenced work form; and Dr. Hassan remarked, "I do believe that he needs advocacy as he is unable to comprehend complicated issues/tasks." (*Id.* at 11). Dr. Hassan continued to note Adams's intellectual disability in subsequent treatment visits. Furthermore, Mrs. Adams testified that in or around 2016, a psychiatrist diagnosed Adams with an intellectual disability, which corresponds to Dr. Hassan's notation in the medical records. (Tosha Adams Dep. at 59, ll. 1–19; 63, ll. 13–14).

The foregoing records represent crucial evidence for the court's determination. In particular, the evidence forestalls an objection that the "relevant time period for assessing the existence of a disability, so as to trigger the ADA's protections, is the time of the alleged discriminatory act." *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019). As the foregoing principle maintains, "[i]t is well settled that 'impairment' in [§ 12102(1)'s] first 'actual disability' prong, is limited to impairments that exist at the time of the adverse employment action and does not include impairments that manifest after the alleged discrimination." *Id.* at 1315.[25]

---

[25] In accordance with these principles, courts routinely hold evidence pertaining to the plaintiff's alleged disability which postdates the relevant time period remains immaterial to demonstrating a disability. *See, e.g.*, *Cash v. Smith*, 231 F.3d 1301, 1306 n.5 (11th Cir. 2000) ("The fact that [the plaintiff] was eventually hospitalized for depression in July and September of 1998 is irrelevant to this case. The employment action that [the plaintiff] is complaining of occurred in late April and early May of 1998, and we evaluate her disability as manifested at that time."); *Quintero v. Rite Aid of N.Y., Inc.*, No. 09 Civ. 6084 (JLC), 2011 U.S. Dist. LEXIS 130920, at *41–44 (S.D.N.Y. Nov. 10, 2011) (A physician's report, "which offer[ed] only psychological diagnoses from outside the relevant time period," remained insufficient to demonstrate the plaintiff's learning disability substantially limited a major life activity.); *Jenkins v. Wholesale Alley, Inc.*, No. 1:05-CV-03266-JEC, 2007 U.S. Dist. LEXIS 110582, at *33 (N.D. Ga. Sept. 11, 2007) (A physician's report on the plaintiff's headaches, which postdated the plaintiff's

The admonition does not apply to this case, however. As the Eleventh Circuit

recognizes,

> [A]bsent evidence of sudden trauma that can cause retardation, the IQ tests [i.e., diagnosis of an intellectual disability] create a rebuttable presumption of a fairly constant IQ [i.e., intellectual disability] throughout . . . life. . . . Other appellate courts have recognized this presumption finding that IQ's [intellectual disability] remain fairly constant throughout life. *See Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages. . . . Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (holding absence of IQ test in developmental years did not preclude finding of mental retardation predating age twenty-two and courts should assume an IQ remained constant absent evidence indicating change in intellectual functioning).

*Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11ᵗʰ Cir. 2001); *see also Siron v. Comm'r of Soc. Sec.*, 757 F. App'x 831, 833 (11ᵗʰ Cir. 2018) ("We have recognized a rebuttable presumption that IQ remains constant throughout life.") (citing *Hodges*, 276 F.3d at 1268-69); *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1330 (N.D. Ala. 2006) ("Many forms of mental illness are temporary, cyclical, or episodic. Mental retardation, by contrast is permanent . . . [except for ameliorat[ion] through education and habilitation."), *aff'd sub nom. Holladay v. Allen*, 555 F.3d 1346 (11ᵗʰ Cir. 2009).

Another court comprehensively elaborated upon the nature of intellectual

---

employment with the defendant, could "not establish that [the] plaintiff suffered from a disability during the relevant time period."); *Prichard v. Dominguez*, No. 3:05cv40/RV/MD, 2006 U.S. Dist. LEXIS 46607, at *37 (N.D. Fla. June 29, 2006) ("It is of no moment that, according to [the social worker], Plaintiff's medical condition and symptoms worsened after the alleged discrimination.").

disabilities:

> [T]he Ohio Court of Appeals's ruling is contrary to the established definition of intellectual disability as set forth in clearly established Supreme Court precedent. As expressed in *Atkins* [*v. Virginia*, 536 U.S. 304 (2002)], "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." 536 U.S. at 318. More precisely, the AAMR [American Association on Mental Retardation] definition in *Atkins* made clear: "Mental Retardation manifests before 18." *Id.* at 308 n. 3. Importantly, the clinical definitions cited with approval by *Atkins* and adopted by [*State v. Lott*, 779 N.E.2d 1011 (Ohio 2002)] do not treat present functioning and early onset as unrelated parts of a disconnected three-part test. To the contrary, a plain reading of these clinical definitions makes clear that if an individual is indeed *presently intellectually disabled,* as the term is understood, the disability would have manifested itself *before the individual turned eighteen.* Thus, pursuant to the clinical definitions in *Atkins,* past evidence of intellectual disability -- including evidence of intellectual disability from an individual's childhood -- is relevant to an analysis of an individual's present intellectual functioning. *See Hall v. Florida,* -- U.S. --, 134 S.Ct. 1986, 1999 (2014) (rejecting Florida's *Atkins* test where it "[ran] counter to the clinical definition cited throughout *Atkins* ").

> This is consistent with the Supreme Court's holding in *Heller v. Doe by Doe,* 509 U.S. 312 (1993). In *Heller,* the Court examined the constitutionality of a statute governing the involuntary civil commitment of the mentally retarded. Relying on clinical definitions of mental retardation from the AAMR and others, the Court held that committing the mentally retarded based on clear and convincing evidence of future dangerousness was constitutional because these definitions indicated that intellectual disability "becomes apparent before adulthood" and "is a *permanent, relatively static condition,* so a determination of dangerousness may be made with some accuracy based on previous behavior." *Id.* at 321–23 (emphasis added) (citations omitted). This was particularly true for adults because "[b]y the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years." *Id.* at 322. Thus, "almost by definition in the case of the retarded [adult] there is an 18-year record upon which to rely" when assessing the individual's *future intellectual functioning. Id.* at 323.[4] * * *

39

[4]Indeed, based on the clinical definitions adopted by *Heller,* courts have overwhelmingly held that intellectual capabilities remain stable throughout life and, consequently, evidence of intellectual disability from earlier in life is directly relevant to present-day [and, obviously, interim] intellectual disability determinations. *See Talavera v. Astrue,* 697 F.3d 145, 152 (2d Cir. 2012) ("We agree with the majority of our sister Circuits that it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a fairly constant IQ throughout their lives.") (internal quotation marks and brackets omitted); *Ochoa v. Workman,* 669 F.3d 1130, 1137-38 (10th Cir.), *cert. denied,* -- U.S. --, 133 S. Ct. 321 (2012) (citing *Heller* for the proposition that because mental retardation is a static condition, any "temporal focus is more semantical than real") (internal quotation marks omitted); *Moormann v. Schriro,* 672 F.3d 644, 649 (9th Cir.), *cert. denied,* -- U.S. --, 132 S. Ct. 1656 (2012) ("The law . . . does not indicate retardation is a product of changing circumstances."); *Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages. . . . Rather, a person's IQ is presumed to remain stable over time."); *Hodges v. Barnhart,* 276 F.3d 1265, 1268 (11th Cir. 2001) ("IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life."); *United States v. Smith,* 790 F.Supp.2d 482, 503-04 (E.D. La. 2011) ("[T]he AAMR/AAIDD has been clear that a person's current strengths and weaknesses are not the best evidence of the relevant facts in an *Atkins* hearing" because IQ "is a relatively stable, immutable trait.").

*Williams v. Mitchell*, 792 F.3d 606, 619-20 & n.4 (6th Cir. 2015) (emphasis in original).[26]

Therefore, the diagnosis of Adams's intellectual disability in or around 2016 fairly indicates he has manifested the impairment since childhood.

There exists other evidence of Adams's intellectual disability, including from his

---

[26] As indicated previously, the DSM-5 corroborates the courts' assessments: "[i]ntellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period." DSM-5 at 33.

childhood. As reflected, Adams partook in special education classes in high school, and he stated he received a "Certificate of Learning disabilities" from the school. (Doc. 26-1 at 71). Mrs. Adams testified Adams "didn't get a high school diploma. They gave him a certificate. He was in special education." (Tosha Adams Dep at 61, ll. 2–4). The court notes that the Rules of the Alabama State Board of Education regarding Special Education Services provide for the award of a graduation certificate for special education students who have not completed the requirements to obtain a high school diploma. *See* Ala. Admin. Code § 290-8-9-.02(6)(f) ("A regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate . . . ."); *id.* at § 290-8-9.10(9) (providing students with disabilities who do not achieve certain requirements a "graduation certificate" and the opportunity to participate in "public activities related to graduation").

The other record evidence of Adams's disability materializes in Mrs. Adams's testimony. Mrs. Adams testified she told Morrow that Adams had a learning disability, and she "always say[s] that Adams has a learning disability." (Tosha Adams Dep. at 33, ll. 3–12; 50, ll. 4–5).[27] [28] Mrs. Adams explained she discovered Adams had a learning disability "the first night [she met him], because he couldn't write down [her] phone

---

[27] As discussed previously, the court discerns that the Adamses used intellectual disability and learning disability interchangeably.

[28] Morrow averred that "[a]lthough Mr. Adams needed reading and writing assistance during the application and onboarding process, [neither] Mr. Adams nor [Mrs. Adams] ever informed me that he had . . . a mental disability." (Doc. 26-3 at 4).

number" and "[h]e couldn't give [her] his phone number because he didn't know it."
(*Id.* at 62, ll. 3–8). Moreover, Mrs. Adams told Sinclair that Adams had an intellectual
disability, and that she "always say[s] that he has a[n] . . . intellectual disability." (*Id.* at
50, ll. 4–7). Ms. Adams similarly averred that based upon Adams's illiteracy, and his
inability to "tell time" or navigate direction, his "disability is very obvious." (*Id.* at 60,
ll. 2–3). Relatedly, Adams testified Crestwood "knew [he] had a problem reading", and
"[p]eople [he] work[ed] with kn[ew] [he] had problems" reading. (Warren Adams Dep.
at 35, l. 22; 99, ll. 8–12).

As the ADAAA and the EEOC regulations direct, "the question of whether an
individual's impairment is a disability under the ADA should not demand extensive
analysis . . . ." 42 U.S.C. § 12101 note; *see also* 29 C.F.R. § 1630.1(c)(4) ("The question
of whether an individual meets the definition of disability  . . . should not demand
extensive analysis."). "Congress intended 'that the establishment of coverage under the
ADA should not be overly complex nor difficult, and expect[ed] that the [ADAAA] will
lessen the standard of establishing whether an individual has a disability for purposes
of coverage under the ADA.'" *Mazzeo*, 746 F.3d at 1268 n.2 (quoting H.R. Rep. No.
110–730, at 9 (2008)) (alterations in original). Based upon the foregoing principles, the
evidence regarding Adams's intellectual disability presents a genuine dispute of material
fact whether he manifests that impairment.

2.      A Genuine Issue of Material Fact Exists as to Whether
        Adams's Alleged Intellectual Disability Affects a Major Life
        Activity

The second consideration of the "actual disability" prong assesses whether a

person's alleged impairment affects a major life activity. 42 U.S.C. § 12102(1)(A). In

undertaking the assessment, the first step entails the delineation of major life activities

limited by the pertinent impairment. For Adams's intellectual disability, a genuine issue

of material fact ensues because of the low bar set by the ADAAA and applicable

regulations regarding his impairment.

The parties debate whether Adams's intellectual disability limits the major life

activities of working. As alluded, however, the inquiry need not venture into that

domain. Pursuant to the ADAAA, major life activities include "learning, reading,

concentrating, thinking, [and] communicating." *Id.* at 12102(2)(A). A "major life activity

also includes the operation of a major bodily function, including but not limited to, . .

. neurological [and] brain . . . functions." *Id.* at 12102(2)(B). The regulations include

these definitions as well. *See* 29 C.F.R. §§ 1630.2(i)(1)(i) & (ii).

By definition, an intellectual disability affects all of the afore-cited life activities.

To recount:

> Intellectual disability (intellectual developmental disorder) is a disorder
> with onset during the developmental period that includes both intellectual
> and adaptive functioning deficits in conceptual, social, and practical
> domains.  The following three criteria must be met:
> A. Deficits in intellectual functions, such a reasoning, problem solving,
> planning, abstract thinking, judgment, academic learning, and learning
> from  experience,  confirmed  by  both  clinical  assessment  and

individualized, standardized intelligence testing.

B.  Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility.  Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C.  Onset of intellectual and adaptive deficits during the developmental period.

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).  The record reflects Adams's diagnosis with an intellectual disability, which necessarily envelopes the foregoing deficits.

Moreover, the record includes anecdotal evidence that Adams manifested those deficits.  Mrs. Adams accompanied Adams to his job interview, completed any paperwork, and answered all interview questions while Adams sat in attendance.  (Tosha Adams Dep. at 33, ll. 3-7; 34, ll. 2-4, 7-9). As she explained to Morrow, Adams is "not able to articulate himself," and "not able to explain things." (*Id.* at 33, ll. 8-12). When presented with the position description, she remarked that she would not have read it to Adams because "he doesn't understand anything." (*Id.* at 37, ll. 19-20). Mrs. Adams shared that she and other unidentified individuals "took the time to show [Adams] how to go back and forth to work on a bus by himself" because he did not have a driver's license, which engendered happiness in Adams due to the independence he gained.  (*Id.* at 39, ll. 5-13).

Moreover, Mrs. Adams described her initial interactions with Adams: "[o]n . . . the first night [we met], because he couldn't write down my phone

number. . . . he couldn't give me his phone number because he didn't know it." (*Id.* at

62, ll. 2–8). Further, Mrs. Adams stated she believed Adams's disability is

> very obvious . . . [b]ecause he's not able to understand a lot of things that people say. He's not able to read. He's not able to tell time. He doesn't know direction. He doesn't even know his ABCs. He can't count probably to 30.

(*Id.* at 60, ll. 2–3, 17–22; 61, ll. 2–4).

Furthermore, Adams acknowledges his deficits. Adams testified his disabilities

include "reading and writing." (Warren Adams Dep. at 88, l. 17). He declared he does

not read "that good" and has "no education." (*Id.* at 88, ll. 10–11). He knows how to

"fill out [his] name and stuff like that", but "[w]hen it gets to . . . big words, [he] can't

do it." (*Id.* at 88, ll. 11–14). Adams further testified: "I can't read. I can't hardly do

nothing. . . . People call me stupid and dumb, don't know how to read. . . . When I was

in high school . . . [people] pick[ed] with me and call[ed] me dumb and didn't know how

to drive, didn't know how to do nothing." (*Id.* at 97, ll. 18-23; 98, ll. 1–6). He stated

that the "people [he] work[ed] with kn[ew] [he] had problems." (*Id.* at 99, ll. 8–9).

Adams specified he is "kind of slow", and his problems involve difficulties reading and

articulating his words. (*Id.* at 99, ll. 12–13). Relatedly, Adams could not properly deliver

meal trays, even after receiving instruction, because he does not read well, which

resulted in him "giving people the wrong tray." (*Id.* at 50, l. 9; 56, ll. 15-17).

Based on the foregoing evidence, there definitely exists a genuine dispute of

material fact whether Adams's alleged intellectual disability limited his major life

activities of learning, reading, concentrating, thinking, communicating, and neurological

brain functions.

3.   A Genuine Issue of Material Fact Exists as to Whether
Adams's Alleged Intellectual Disability Substantially Limited
the Identified Major Life Activities

The final assessment for the "actual disability" prong queries whether Adams's

alleged impairment substantially limits the identified major life activities.   The

regulations provide that certain "rules of construction apply when determining whether

an impairment substantially limits an individual in a major life activity":

> (i) The term "substantially limits" shall be construed broadly in favor of
> expansive coverage, to the maximum extent permitted by the terms of the
> ADA. "Substantially limits" is not meant to be a demanding standard.
>
> (ii) An impairment is a disability within the meaning of this section if it
> substantially limits the ability of an individual to perform a major life
> activity as compared to most people in the general population. An
> impairment need not prevent, or significantly or severely restrict, the
> individual from performing a major life activity in order to be considered
> substantially limiting. Nonetheless, not every impairment will constitute a
> disability within the meaning of this section.
>
> (iii) The primary object of attention in cases brought under the ADA
> should be whether covered entities have complied with their obligations
> and whether discrimination has occurred, not whether an individual's
> impairment substantially limits a major life activity. Accordingly, the
> threshold issue of whether an impairment "substantially limits" a major
> life activity should not demand extensive analysis.
>
> (iv) The determination of whether an impairment substantially limits a
> major life activity requires an individualized assessment. However, in
> making this assessment, the term "substantially limits" shall be interpreted
> and applied to require a degree of functional limitation that is lower than
> the standard for "substantially limits" applied prior to the ADAAA.

> (v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis.

29 C.F.R. § 1630.2(j)(1). The regulations provides that the foregoing principles of construction "are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended." *Id.* at § 1630.2(j)(3)(i).

Even more pronounced, the regulations lessen the requirements for the inquiry at bar.  In a definitional section entitled "Predictable assessments," the rule declares that "the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraphs (g)(1)(i) (the "actual disability" prong) . . . ." *Id.* at § 1630.2(j)(3)(ii). "Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity.  Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward." *Id.*

Most crucial for the present determination, one "predictable assessment" "easily" engenders the "conclu[sion] that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . *an intellectual disability (formerly termed mental retardation) substantially limits brain function . . . ." Id.* at §

1630.2(j)(3)(iii) (emphasis added).

Based upon the foregoing directives and principles from the definitional regulations, there surely exists a genuine dispute of material fact whether Adams's diagnosed intellectual disability substantially limits major life activities. The anecdotal evidence reviewed previously portrays that Adams manifests deficits in brain function "as compared to most people in the general population," especially as the comparison "usually will not require scientific, medical, or statistical analysis." Given the principle that "'[s]ubstantially limits' is not meant to be a demanding standard"; the directive that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis"; and the predictable assessment that intellectual disabilities substantially limits brain functions, a reasonable jury may conclude that Adams's alleged intellectual disability substantially limits some of his major life activities.

### B.   Adams Has Not Proceeded on the Record of a Learning Disability Prong

Adams fails to elicit any facts in support of the second prong of the disability standard. To recount, a plaintiff may establish a disability pursuant to the second prong by demonstrating a record of an impairment that substantially limits a major life activity. 42 U.S.C. § 12102(1)(B); 29 C.F.R. § 1630.2(k)(1). A plaintiff may satisfy this burden by proving he "has a history of, or has been misclassified as having," a substantially limiting impairment. 29 C.F.R. § 1630.2(k)(1). Such history or misclassification may

manifest in various "types of records . . . , including but not limited to, education, medical, or employment records."  C.F.R. Part 1630, App. § 1630.2(k).

The EEOC's Interpretive Guidance forestalls Adams's reliance upon this prong:

> Such evidence that an individual has a past history of an impairment that substantially limited a major life activity is all that is necessary to establish coverage under the second prong. An individual may have a "record of" a substantially limiting impairment -- and thus be protected under the "record of" prong of the statute -- even if a covered entity does not specifically know about the relevant record. Of course, for the covered entity to be liable for discrimination under title I of the ADA, *the individual with a "record of" a substantially limiting impairment must prove that the covered entity discriminated on the basis of the record of the disability.*

29 C.F.R. Pt. 1630, App. § 1630.2(k) (emphasis added).

In his summary judgment opposition, Adams has not argued or even mentioned – and thus has not pointed to any evidence – that Crestwood discriminated on the basis of Adams's <u>record</u> of intellectual disability.  Adams has only referenced reliance on the actual disability prong.  (Doc. 31 at 9).  Therefore, Adams has abandoned resort to the "record of disability" prong.[29]

### C.   Adams Cannot Proceed With a Regarded-As Discrimination Claim Under the Third Prong Based Upon His Reasonable Accommodation Claim

A plaintiff may establish a disability pursuant to the third prong of the section defining "disability" by demonstrating his employer regarded him as having an

---

[29] It appears that reliance upon this prong would have been superfluous anyway, as "[i]ndividuals who are covered under the "record of" prong will often be covered under the first prong of the definition of disability as well."  29 C.F.R. Pt. 1630, App. § 1630.2(k)

impairment.  *See* 42 U.S.C. § 12102(1)(C).  A plaintiff may satisfy this standard by demonstrating he "has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment[,] whether or not the impairment limits or is perceived to limit a major life activity."  *Id.* § 12102(3)(A).

Based upon Adams's claims, he cannot proceed under this prong.  Adams essentially argues that Crestwood failed to reasonably accommodate his requests for job modifications, and this failure led him to quit his employment.[30]  As provided by the ADAAA, an employer "need not provide a reasonable accommodation . . . to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."  42 U.S.C. § 12201(h); *see also* 29 C.F.R. § 1630.9(e) (An employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong."). That is, "an individual covered by the 'regarded as' prong of the definition of disability is not entitled to reasonable accommodation."  1 ADA: Employee Rights § 3.04 (2020) (citing § 12201(h)).  Therefore, even if Adams sustained coverage under the regarded-as disability prong, he would not be entitled to his requested accommodations.

Indeed, although Crestwood argued in its summary judgment motion that Adams could not sustain a regarded-as claim, Adams's opposition to summary judgment did not contest Crestwood's contention.  Rather, the opposition focused on

---

[30] In fact, Adams's continued threat "to quit every day" spurred Mrs. Adams to call the director of human resources to address the lack of an accommodation.  (Tosha Adams Dep. at 46, ll. 10–13).

Adams's choice of performing the assigned duties or quitting. (*See* Doc. 31 at 6) ("[Mrs.] Adams recalled that Morrow said that if Mr. Adams did not like the assignments he should just quit. T. Adams pg. 52:17- 23, pg. 53:1 -17.   Ms. Sinclair [the human resources director] confirmed that was nothing that could be done and Mr. Adams either did the job or quit. *Id.*").   Therefore, based upon the foregoing analysis, Adams has abandoned his regarded-as disability discrimination claim.

### D. A Reasonable Juror Cannot Conclude Crestwood Discriminated Against Adams Based Upon His Alleged Anxiety

Adams alleges he "is disabled by way of anxiety", and contends Crestwood failed to reasonably accommodate his anxiety in violation of the ADA.  (Doc. 1 ¶¶ 5, 22).  As pertinent here, the ADA forbids an employer from "discriminat[ing] against a qualified individual on the basis of a disability" by "not making reasonable accommodations to the *known* . . . mental limitations of an . . . employee."  42 U.S.C. § 12112(a), (b)(5)(A) (emphasis added).

Thus, a plaintiff cannot demonstrate a *prima facie* case of disability discrimination absent evidence the employer knew of her alleged disability.  *See July v. Bd. of Water & Sewer Comm'rs of City of Mobile*, No. 11-0635-WS-N, 2012 U.S. Dist. LEXIS 169199, at *34 n.13 (S.D. Ala. Nov. 29, 2012) ("Obviously, an employer cannot discriminate against an employee based on a disability that it does not know he has."); *Rogers v. CH2M Hill*, 18 F. Supp. 2d 1328, 1334 (M.D. Ala. 1998) ("If an employer does not know of the specific cause for some behavior of the employee, the employer might attribute that

behavior to a non-protected cause. Notice by the employee is needed in an ADA case, therefore, in large part because without it the employer might not ever know that the employee suffers from a disability."). Here, Adams fails to demonstrate Crestwood knew of his alleged anxiety. Accordingly, no reasonable juror could conclude Crestwood failed to reasonably accommodate Adams's alleged anxiety in violation of the ADA.

Adams's primary care physician, Dr. Hassan, treated Adams for anxiety, and Mrs. Adams testified that a certified registered nurse practitioner ("CRNP") at Quality of Life Health Services treated Adams for anxiety during his employment with Crestwood. (Tosha Adams Dep. at 55, ll. 13–22). In addition, Mrs. Adams averred that due to Adams's frustration with delivering meal trays to hospital patients, the CRNP either increased Adams's anxiety medication or prescribed an additional anxiety medication during his employment with Crestwood. (*Id.* at 55, ll. 5–16). However, Adams testified he "didn't tell anybody" at Crestwood he experienced anxiety, and no one at Crestwood told him they believed he experienced anxiety. (Warren Adams Dep. at 100, ll. 15–22).

Based upon the foregoing evidence, a reasonable juror may not conclude Crestwood knew Adams had anxiety. Although the Adamses aver Adams received treatment for anxiety during his employment with Crestwood, as afore-cited, Adams testified he never informed anyone at Crestwood he experienced anxiety and no one represented to Adams they believed he experienced anxiety. Adams's testimony thus forecloses his claim that Crestwood discriminated against him on the basis of his alleged

anxiety. *See Williamson v. Clarke Cnty. Dep't of Human Res.*, 834 F. Supp. 2d 1310 (S.D. Ala. 2011) (the plaintiff failed to establish a *prima facie* case of disability discrimination because she never informed the decisionmaker she suffered from ADHD); *Klein v. Dep't of Children & Fams. Servs.*, 34 F. Supp. 2d 1367 (S.D. Fla. 1998) (the plaintiff could not demonstrate her employer discriminated against her based upon her alleged bipolar disorder because she never informed her employer she suffered such impairment); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 950 (N.D. Ga. 1995) (The employer lacked knowledge of the plaintiff's alleged bipolar disorder because she never informed the employer of her diagnosis, and any knowledge that she "had some type of medical condition related to stress" did not constitute knowledge of her specific impairment).

Absent evidence Crestwood knew Adams experienced anxiety, no reasonable juror could conclude Crestwood discriminated against Adams on the basis of his alleged anxiety, and, therewith, Crestwood garners summary judgment on this theory of liability.

## II.   GENUINE ISSUES OF MATERIAL FACTS EXIST AS TO WHETHER ADAMS COULD PERFORM THE ESSENTIAL FUNCTIONS OF HIS POSITION AT CRESTWOOD

In addition to establishing that a plaintiff falls within the definition of having a disability under the ADA, the prima facie showing requires a plaintiff to demonstrate he or she is a qualified individual. *Lewis*, 934 F.3d at 1179. The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. § 12111(8). Crestwood contends that Adams's requests for his initial work schedule, to not work in the kitchen, and to not deliver meal trays demonstrate he could not perform the essential functions of his position.  Crestwood may be correct that working in the kitchen may have been an essential function of his job, but delivering meal trays to patients and working assigned hours, regardless of their irregularity, may not have been.

As an initial matter, the court notes that Crestwood concedes that Adams was a qualified individual.  Adams's supervisor at Crestwood, Morrow, declared that Adams "was a good and reliable employee" and "able to perform all of the responsibilities of the Porter/Dishwasher role."  (Doc. 26-3 at 3).  Morrow reiterated in his declaration that Adams "was one of my best workers" and "able to handle all of the responsibilities of the Porter/Dishwasher role and did so efficiently and effectively."  (*Id.*)  In its summary judgment briefs, Crestwood acknowledged that Adams could perform all of the responsibilities of his position.  (Doc. 25 at 13; Doc. 33 at 7).  With these concessions, Adams establishes that he was a qualified individual for the Porter/Dishwasher position.

Nonetheless, Adams argued that he could not deliver meal carts, work in the kitchen, or work longer hours, and Crestwood asserts those duties represent essential functions of the Porter/Dishwasher position. Therefore, because Adams contests whether the afore-cited duties are essential functions, and because Crestwood was not obligated to grant reasonable accommodations if they constituted the elimination of

essential functions, the court will assess whether a trial issue persists as to whether those duties are essential functions.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability [held]. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A function may be essential "because the reason the position exists is to perform that function" or "because of the limited number of employees available among whom the performance of that job function can be distributed . . . ." *Id.* at § 1630.2(n)(2)(i)-(ii).

"'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.'" *Lewis*, 934 F.3d at 1182 (quoting *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)). "Courts consider the employer's judgment of whether a particular function is essential," *Lewis*, 934 F.3d at 1182 (citing *D'Angelo*, 422 F.3d at 1230), as well as

> any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs.

*Lewis*, 934 F.3d at 1182 (quoting *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii))). "Accordingly, 'although the employer's judgment is 'entitled to substantial weight in the calculus,' this factor alone

is not conclusive.'" *Lewis*, 934 F.3d at 1182 (quoting *Samson*, 746 F.3d at 1201).

In this case, the Porter/Dishwasher job description warrants denial of summary judgment as to the qualified individual issue. The *Lewis* decision is especially instructive for the court's determination. In *Lewis*, the plaintiff, a police detective, requested a reasonable accommodation to be excepted from training requiring exposure to a Taser shock and pepper spray due to her prior heart attack. 934 F.3d at 1173-74. The defendant argued that such exposure was an essential function of her position. *Id.* at 1182. In considering whether exposure to the Taser shocks and pepper spray constituted essential functions of the police detective position, the Eleventh Circuit focused upon the defendant's written job description for the position, which did not reference such exposure anywhere in the document. *Id.* at 1182-83. Along with evidence that the manufacturer did not require trainees to receive a Taser shock, the Court held that a reasonable jury could conclude that exposure to a Taser shock or pepper spray did not constitute essential functions of the police detective position. *Id.* at 1183.

In the case at bar, the Porter/Dishwasher Position Description describes the following job duties as the "Position Purpose":

> overall cleanliness of the kitchen to include: cleaning all pots, pans, dishes and utensils utilizing the dishmachine and three (3) compartment sink system; [r]emoval of all trash from kitchen to proper receptacle area; [c]leaning and sanitation of all kitchen equipment to include but not limited to: floors, walls, refrigerators, freezers and storage racks and other duties as assigned.

(Doc. 26-1 at 48).  As reflected, the Porter/Dishwasher Position Description does not reference meal tray delivery at all, an observation which countermands Crestwood's assertion, via Morrow's declaration, that the responsibility constituted an essential function.  The Position Description further states the Porter/Dishwasher "[m]ust be able to . . . push carts that weigh approximately 100 pounds," (*id.*), yet there exists no indication that reference reflects meal cart delivery or just a part of kitchen duty.  And although the Position Description asserts "job duties and responsibilities may change and additional job duties may be requested," (*id.*), this assertion does not establish the existence of an essential function.

As further evidence that meal tray delivery to patients was not an essential function of the Porter/Dishwasher position, Adams did not perform these duties when he initially worked in the position.  Furthermore, Morrow informed the Adamses that upon hiring a new worker, Adams would not have to perform the meal tray delivery duties, which indicates that the duties may not have been an essential function for Adams's Porter/Dishwasher position.  Based upon the foregoing review, there remains a genuine issue of material fact whether meal tray delivery constitutes an essential function of the Porter/Dishwasher position.

The change in Adams's job schedule presents a closer issue whether Crestwood is entitled to summary judgment on the essential functions assessment. To recount, Morrow testified that "[w]hen the Food and Nutrition Services Department became short staffed, [he] needed [Adams] to work a different shift on certain days." (Doc. 26-

3 at 3, ¶ 8). The Adamses complained about the change in schedule, whereby Adams worked longer hours and/or worked into the evening.  Adams's time record reveals that after his first week and a half of employment with Crestwood, his workday hours varied. As reflected in the record, Adams's workweek generally consisted of him working from approximately 9:30 a.m. to 3:00 p.m., or 11:00 a.m. to anywhere from 7:45 p.m. to 8:15 p.m., with a couple of notations when he worked from approximately 7:00 a.m. to 3:00 p.m. (Doc. 26-1 at 49-51).

The court heeds Crestwood's reliance upon *Davis v. Florida Power & Light Co.*, 205 F.3d 1301 (11th Cir. 2000), wherein the Eleventh Circuit held the plaintiff was not a qualified individual because mandatory overtime work was an essential function of his position. *Id.* at 1305.  However, there arises one critical fact that counters Crestwood's contention that working the assigned schedule constituted an essential function of his job, regardless of the irregular hours: in a section of the Porter/Dishwasher Job Position Description listing requirements, Morrow answered "NO" as to whether the position "May be subject to Irregular hours." (Doc. 26-1 at 48). Based upon this evidence, a reasonable jury may conclude that an irregular schedule did not represent an essential function of the Porter/Dishwasher position, yet there remains the issue whether request for the regular schedule represented a reasonable accommodation. As a result, ultimate resolution awaits determination in the next section.

Finally, there should be no dispute that working in the kitchen washing dishes and disposing of garbage constituted essential functions of Adams's employment.  The

Position Description expressly portrays that washing dishes and removing trash from the kitchen represented two aspects of the position's purpose. *Id.* Morrow buttressed the foregoing contention in his declaration. (Doc. 26-3 at 2). Therefore, Adams cannot maintain that working in the kitchen was not an essential function of his position.

Based on the foregoing analyses, genuine issues of material facts persist as to whether Adams was a qualified individual with a disability pursuant to the statutory and regulatory definitions.

## III.   A REASONABLE JURY MAY CONCLUDE THAT ADAMS'S PERTINENT REQUESTS FOR ACCOMMODATIONS WERE REASONABLE

Regarding the final element of the prima facie standard, which represents the last issue contested in the summary judgment motion, Adams must demonstrate a triable issue as to whether Crestwood discriminated against him on the basis of his disability. An employee satisfies this element by establishing a genuine issue of material fact whether the employer failed to accord a reasonable accommodation for the employee's disability. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."); *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (framing issue on appeal as "whether Defendant discriminated against Plaintiff by failing to provide a reasonable accommodation that would have enabled her to perform either her CSO duties or the essential duties"); *Holly*, 492 F.3d at 1262 ("[A]n

employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship.") (emphasis in original); *see also* 42 U.S.C. § 12112(b)(5)(A).  That is, an employer's failure to provide a reasonable accommodation may be evidence that that employer has discriminated against an employee "on the basis of" his or her disability.

Adams straightforwardly establishes a genuine issue of material fact on this element vis-à-vis the request to be relieved from the meal tray delivery duty.  Most pertinent here, reasonable accommodation "means"

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

"What constitutes a reasonable accommodation depends on the circumstances, but it may include 'job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position' among other things."  *Id.* (quoting 42 U.S.C. § 12111(9)(B)).  "The employee has the burden of identifying an accommodation and demonstrating that it is reasonable," and "an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has

been made.'" *Id.* at 1255-56.

Here, the Adamses requested relief from the meal tray delivery duty given Adams's experience making mistakes in deliveries, particularly due to his lack of reading skills and the associated complaints he received from nurses regarding his performance of the duty. Because a genuine issue of material fact persists as to whether delivering meal trays constitutes an essential function of the Porter/Dishwasher position, this factor does not mar the reasonableness of Adams's request. Furthermore, given the importance of the meal delivery duty to Crestwood's operations and the health and safety of its patients, the reasonableness of the request for relief from the duty manifests concretely given that Adams, according to the testimony of the Adamses, botched the responsibility regularly. Indeed, that Adams botched the meal tray delivery duty regularly, and it may not constitute an essential function, conveys that seeking an accommodation to remove the duty from his responsibilities may have evinced good common sense.[31]

Moreover, a reasonable jury may conclude that relief from the meal tray delivery duty constitutes a reasonable accommodation even if it does not conclude such duty

---

[31] Furthermore, and notably, Adams testified he "[s]ometimes" delivered meal trays to patients at a previous hospital job; however, the hospital staff "show[ed] [him] where to take" the trays and "didn't leave [him] by [him]self." (Warren Adams Dep. at 14, l. 20; 15, ll. 4–5). Adams receiving such assistance at his previous hospital job engenders a rational inference he reasonably requested relief from the meal tray delivery duty as an accommodation at Crestwood.

constituted an essential function of the Porter/Dishwasher position.[32]  To be sure, Eleventh Circuit decisions declare that "[a]n accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White*, 818 F.3d at 1255 (citation omitted); *accord Bagwell v. Morgan Cnty. Comm'n*, 676 F. App'x 863, 866 (11th Cir. 2017); *Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 874 (11th Cir. 2016); *Dickerson v. Sec'y, Dep't of Veterans Affs. Agency*, 489 F. App'x 358, 360 (11th Cir. 2012); *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010); *Webb v. Donley*, 347 F. App'x 443, 445–46 (11th Cir. 2009); *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1259–60 (11th Cir. 2001); *LaChance v. Duffy's Draft House*, 146 F.3d 832, 835 (11th Cir. 1998).

However, the Eleventh Circuit likewise provides that "the ADA may require an employer to restructure a particular job by *altering or eliminating some of its marginal functions* . . . ." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) (citations omitted) (emphasis added); *see also Holly*, 492 F.3d at 1256 ("On the other hand, 'the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions.") (quoting *Lucas*, 257 F.3d at 1260) (emphasis in original).[33]  This

---

[32] As referenced previously, if the meal tray delivery duty did not constitute an essential function of the Porter/Dishwasher position, the jury may reasonably conclude Adams could perform the essential functions of the Porter/Dishwasher position without a reasonable accommodation.  *See* 42 U.S.C. § 12111(8).

[33] *See also Bagwell v. Morgan Cty. Comm'n*, 676 F. App'x 863, 866 (11th Cir. 2017) (same); *Ivey v. First Quality Retail Serv.*, 490 F. App'x 281, 285 (11th Cir. 2012) (same); *Calvo v. Walgreens Corp.*, 340 F. App'x 618, 623 (11th Cir. 2009) (same); *Woodruff v. Sch. Bd. of Seminole Cty., Fla.*, 304 F. App'x 795, 800 (11th Cir. 2008) (same).

admonition corresponds to the statute's inclusion of job restructuring as a reasonable accommodation in appropriate circumstances, 42 U.S.C. § 12111(9)(B), as reflected in the EEOC's interpretive guidance to its regulations:

> Another of the potential [reasonable] accommodations listed is "job restructuring." An employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions. For example, an employer may have two jobs, each of which entails the performance of a number of marginal functions. The employer hires an individual with a disability who is able to perform some of the marginal functions of each job but not all of the marginal functions of either job. As an accommodation, the employer may redistribute the marginal functions so that all of the marginal functions that the individual with a disability can perform are made a part of the position to be filled by the individual with a disability. The remaining marginal functions that the individual with a disability cannot perform would then be transferred to the other position. See Senate Report at 31; House Labor Report at 62.

29 C.F.R. § Pt. 1630, App.

The Eleventh Circuit's decision in *Holly*, *supra*, illustrates the application of the foregoing provisions. In *Holly*, the plaintiff sought a reasonable accommodation from the defendant-employer's strict punctuality policy, which deemed an employee tardy if he or she clocked in a second or more after the shift reporting time. 492 F.3d at 1253, 1256. The plaintiff had a disability which regularly occasioned tardy attendance, and he sought an accommodation to allow him to report to work tardily. *Id.* at 1254. The defendant refused to accommodate the plaintiff's disability, and the plaintiff's violations of the punctuality policy ultimately resulted in his termination. *Id.*

On appeal, the Eleventh Circuit determined that a genuine dispute of material fact existed as to whether punctuality was an essential element of the plaintiff's job, and

thus, whether the plaintiff was a qualified individual with a disability given his inability to heed the defendant's strict punctuality policy. *Id.* at 1256-61. Correspondingly, the Court accredited the plaintiff's argument that if strict punctuality constituted a marginal function of the job, then the defendant's failure to reasonably accommodate the plaintiff by modifying his work schedule averred a disability discrimination claim appropriate for trial. *Id.* at 1257, 1261-62. As the Court declared, "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Id.* at 1262 (emphasis in original). Therefore, although "an accommodation that does not enable the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA," *id.* at 1262 n.16, the Court elucidated that alteration or removal of a marginal function may constitute a reasonable accommodation that enables an employee to perform his or her essential functions.

As portrayed previously, a similar situation emerged in this case. If delivering meal trays was not an essential element of Adams's job, then Crestwood's alleged failure to reasonably accommodate Adams by eliminating that marginal duty from his responsibilities presents a disability discrimination claim appropriate for trial. That is, the failure to remove an alleged marginal function from Adams's job may have prevented him from performing the essential functions of his position, particularly as Adams avers he "lost his employment" due to Crestwood's alleged failure to

accommodate his disability. (Doc. 1 at 6).

Indeed, the EEOC expressly provides that such alteration of marginal duties constitutes a reasonable accommodation for individuals with intellectual disabilities:

> **7. What specific types of reasonable accommodations may employees with intellectual disabilities need to do their jobs or to enjoy the benefits and privileges of employment?**
>
> The following are accommodations that employees with intellectual disabilities may need:
>
> * **Job restructuring** (e.g., exchanging non-essential functions between employees)
> **Example:** A crew of three employees works the concession stand of a baseball stadium. One of the employees has an intellectual disability. He helps stock the counter with candy and snacks; at closing time he cleans the counters and equipment and restocks the counters with supplies. However, he cannot perform the marginal function of counting money at closing time. The marginal functions of another concession stand employee include placing empty boxes and trash in designated bins at closing time, which is something that the employee with an intellectual disability can perform. Switching the marginal functions performed by the two employees is a reasonable accommodation.

U.S. E.E.O.C., Questions & Answers About Persons With Intellectual Disabilities in the Workplace and the Americans With Disabilities Act (Oct. 20, 2004), *available at*, 2004 WL 2368526. As reflected, reasonably accommodating an individual by restructuring a job's marginal functions enables the performance of essential functions by enabling the individual to do his or her job.

In addition, the EEOC's guidance expressly deems the afore-described job restructuring as a type of reasonable accommodation that enables individuals to not only perform essential functions, it also enables them to "enjoy the benefits and

privileges of employment." *Id.* As cited previously, 29 C.F.R. § 1630.2(o)(1) expressly defines a reasonable accommodation not only as one which "enable[s] an individual with a disability who is qualified to perform the essential functions of that position", but also one which "enable[s] a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii); *see* 29 C.F.R. Part 1630 App. § 1630.2(o) ("In general, an accommodation is any change in the work environment or in the way things are customarily done that *enables an individual with a disability to enjoy equal employment opportunities.* There are three categories of reasonable accommodation. These are (1) accommodations that are required to ensure equal opportunity in the application process; (2) accommodations that enable the employer's employees with disabilities to perform the essential functions of the position held or desired; and (3) *accommodations that enable the employer's employees with disabilities to enjoy equal benefits and privileges of employment as are enjoyed by employees without disabilities.*") (emphases added).[34]

As applied here, a reasonable jury may find Adams can perform the essential functions of the Porter/Dishwasher position – and thus constitutes a qualified

---

[34] And as elaborated previously, the EEOC regulations implementing the ADAAA appear to constitute legislative rules carrying the force and effect of law. *See* 42 U.S.C. § 12205a; *Ramsay*, 968 F.3d at 257 n.6; *Badwal*, 139 F. Supp. 3d at 309 n.9; *Floyd*, 85 F. Supp. 3d at 500 n.24; *Morriss*, 2014 WL 6612604, at *2 n.5; *Estate of Murray*, 2011 WL 5449364, at *6 n.15.

individual – without a reasonable accommodation.  As discussed previously, the record evinces a genuine issue of material fact whether the meal tray delivery duty constituted an essential function of the Porter/Dishwasher position.  If the delivery duty did not constitute an essential function of the Porter/Dishwasher position, and instead constituted only a marginal function, the jury need not conclude Adams's request for relief therefrom constituted a reasonable accommodation necessary for the performance of his job's essential functions.

Rather, the jury may conclude that eliminating the meal tray delivery duty because it constituted a marginal function – that is, granting a reasonable accommodation that did not present an undue hardship -- would have enabled Adams "to enjoy equal benefits and privileges of employment."  29 C.F.R. § 1630.2(o)(1)(iii).  In short, the reasonableness of Adams's requested accommodation does not, by logical necessity, turn upon his performance of the essential functions of the Porter/Dishwasher position.[35]  *See Novella v. Wal-Mart Stores, Inc.*, 226 F. App'x 901, 903 (11th Cir. 2007) (The "regulations define the term 'reasonable accommodation' to include both modifications that enable an employee to 'perform the essential functions' of the job, and modifications that enable an employee to 'enjoy the equal benefits and privileges

---

[35] Of course, as referenced previously, if the jury determines the meal tray delivery duty *did* constitute an essential function of the Porter/Dishwasher position, it may reasonably conclude Adams request for relief therefrom would have required Crestwood to eliminate an essential function, and thus did not constitute a reasonable accommodation.  *See D'Angelo v. Conagra Foods*, 422 F.3d 1220, 1229 (11th Cir. 2009) ("[T]he ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job.") (second and third alterations in original).

of employment' as other, non-disabled employees.").

Eleventh Circuit district courts consistently recognize that reasonable accommodations encompass adaptations that enable employees with disabilities to enjoy the equal benefits and privileges of their employment.[36]  *See Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1492 (M.D. Ala. 1994) ("A reasonable accommodation . . . is one that would enable an employee with a disability to enjoy an equal opportunity for benefits and privileges of employment as are enjoyed by employees without disabilities."); *accord Laun v. Bd. of Regents*, No. CV 118-033, 2019 U.S. Dist. LEXIS 164517, at *18–19 (S.D. Ga. Sept. 25, 2019); *Washington v. Fanning*, No. CV 116-107, 2019 U.S. Dist. LEXIS 38352, at *12 (S.D. Ga. Mar. 11, 2019); *Hoskins v. City of Atlanta*, No. 1:15-CV-00508-AT-CMS, 2018 U.S. Dist. LEXIS 228433, at *8 (N.D. Ga. Jan. 26, 2018); *Daughtry v. Army Fleet Support, LLC*, 925 F. Supp. 2d 1277, 1282 (M.D. Ala. 2013); *Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1280 (N.D. Ala. 2009);

---

[36] Relatedly, in *Santacrose v. CSX Transp., Inc.*, No. 3:06-cv-461-J-25JRK, 2007 U.S. Dist. LEXIS 105634 (M.D. Fla. Nov. 6, 2007), the district court cited *Lucas v. W.W Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) for the proposition that an accommodation is only reasonable if it enables the employee to perform the essential functions of the job, yet proceeded to considered the reasonableness of the plaintiff's requested accommodation after concluding the plaintiff did not require an accommodation to perform the essential functions of his job.  The plaintiff in *Santacrose* requested his employer to grant him an eight-hour work restriction to accommodate his back spasms and avoid overtime shifts. The court found the plaintiff "presented sufficient evidence that he *can* perform the essential function[s] [of his job] without [the restriction]."  *Santacrose*, 2007 U.S. Dist. LEXIS 105634, at *18 (emphasis in original).  Nonetheless, the court determined the restriction did not represent a reasonable accommodation because the plaintiff could utilize his unpaid leave allotment to avoid the overtime shifts, and because the restriction would contravene other employee's seniority rights.  *Id.* at *18–21.  Notably, therefore, the plaintiff's ability to perform the essential functions of the job without the restriction did not categorically preclude its reasonableness as an accommodation.  The Eleventh Circuit agreed the restriction did not constitute a reasonable accommodation without discussing the district court's qualified individual analysis.  *See Santacrose v. CSX Transp., Inc.*, 288 F. App'x 655 (2008).

*Sumner v. Michelin N. Am.*, 966 F. Supp. 1567 (M.D. Ala. 1997); *McCollough v. Atlanta Bev. Co.*, 929 F. Supp. 1489, 1504 n.10 (N.D. Ga. 1996); *Dockery v. N. Shore Med. Ctr.*, 909 F. Supp. 1550, 1555 (S.D. Fla. 1995); *Robertson v. Ala. Dep't of Econ. & Comty. Affs.*, 902 F. Supp. 1473, 1484 (M.D. Ala. 1995).

Other circuits likewise uphold the proposition that the ADA does not limit reasonable accommodations to those facilitating the performance of essential functions. *See, e.g.*, *Stokes v. Nielsen*, 751 F. App'x 451, 454 (5th Cir. 2018) ("[O]ur circuit has explicitly rejected the requirement that requested modifications must be necessary to perform essential job functions to constitute a reasonable accommodation.") (citing, *inter alia*, 29 C.F.R. § 1630.2(o)(1)(iii)); *Hill v. Assocs. for Renewal in Educ.*, 897 F.3d 232, 238 (D.C. Cir. 2018) ("[Defendant's] assertion that [Plaintiff] did not need the accommodation of a classroom aide because he could perform the essential functions of his job without accommodation, 'but not without pain,' is unavailing. A reasonable jury could conclude that forcing [Plaintiff] to work with pain when that pain could be alleviated by his requested accommodation violates the ADA.") (internal citation omitted) (citing, *inter alia*, *Gleed v. AT&T Mobility Servs.*, LLC, 613 F. App'x 535, 538–39 (6th Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)(iii))); *Feist v. Louisiana*, 730 F.3d 450, 453 (5th Cir. 2013) ("The text [of the ADA] gives no indication that an accommodation must facilitate the essential functions of one's position. . . . The ADA's implementing regulations also indicate that reasonable accommodation need not relate to the performance of essential job functions.") (citing 20 C.F.R. § 1630.2(o)(1)); *Sanchez v.*

*Vilsack*, 695 F.3d 1174, 1181 (10th Cir. 2012) (The court rejected the employer's contention it need not provide a transfer accommodation if the employee remains able to perform the essential functions of the job because "the EEOC interpretive regulations contemplate accommodations that are wholly unrelated to the essential functions of a job.") (citing, *inter alia*, 29 C.F.R. § 1630.2(o)(1)(iii)); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (Pursuant to 29 C.F.R. § 1630.2(o)(1)(iii), "[a] change in shifts could be [a reasonable] accommodation."); *Jacques v. Clean-Up Grp.*, 96 F.3d 506, 515 n.9 (1st Cir. 1996) ("We recognize that, even when qualified employees are able to perform a job's essential functions, employers may not be relieved of their duty to accommodate where accommodations are required to allow equal enjoyment of employment privileges and benefits or to pursue therapy or treatment.") (citing *Buckingham v. United States*, 998 F.2d 735, 740–41 (9th Cir. 1993), *superseded by regulation on other grounds*, 29 C.F.R. § 1614.203, *as recognized in Fedro v. Reno*, 21 F.3d 1391 (7th Cir. 1994)); *Buckingham*, 998 F.2d at 740 ("[C]ontrary to what the government urges, employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job. Qualified [disabled] employees who can perform all job functions may require reasonable accommodation[s] to allow them to . . . enjoy the privileges and benefits of employment equal to those enjoyed by non-handicapped employees . . . ."); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992) ("The Rehabilitation Act calls for reasonable accommodations that permit [disabled] individuals to lead normal lives, not merely accommodations that facilitate the

performance of specific employment tasks."); *Clark v. Sch. Dist. Five of Lexington & Richland Cntys.*, 247 F. Supp. 3d 734, 744 (D.S.C. 2017) ("A plaintiff may also be entitled to a reasonable accommodation if it enables him or her to enjoy 'equal benefits and privileges' of employment.") (quoting 29 C.F.R. § 1630.2(o)(1)(iii)); *Merrill v. McCarthy*, 184 F. Supp. 3d 221, 238–39 (E.D.N.C. 2016) ("To be sure, an employer has a duty to provide reasonable accommodations that enable a disabled employee to perform essential job functions. But, that is not the employer's only duty. If the employee needs reasonable accommodation to enable her 'to enjoy equal benefits and privileges of employment,' the employer is obligated to provide it as well. . . . While the fact that plaintiff could perform essential job duties without accommodation might bear on the reasonableness of telework as an accommodation, it does not defeat her failure to accommodate claim outright.") (quoting 29 C.F.R. § 1630.2(o)(1)(iii)).[37]

---

[37] Notably, the *Feist* and *Sanchez* Courts distinguished prior precedent suggesting a reasonable accommodation must enable the employee to perform the essential functions of a job.  In *Feist*, the Fifth Circuit ruled the district court improperly relied upon *Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997) to hold the plaintiff's requested accommodation was unreasonable because it did not pertain to her ability to perform the essential functions of her job.  *Feist v. Louisiana*, 730 F.3d 450, 453 (5th Cir. 2013).  In *Burch*, the Court opined "the existence vel non of a disability or impairment is material to a reasonable accommodation claim only insofar as it limits an employee's ability to perform his or her job."  *Burch*, 119 F.3d at 314.  The *Burch* Court further observed:  "To assert a discrimination claim under the reasonable accommodation provision, . . . [the plaintiff] must demonstrate that a substantially limiting impairment somehow affected his ability to perform his job. Without such a showing, there would be nothing for an employer to accommodate."  *Id.* at n.4.  The *Feist* Court distinguished *Burch* as "inapposite", however, "because the question there was whether the plaintiff was a 'qualified individual with a disability,'" which issue the parties did not dispute in *Feist*.  *Feist*, 730 F.3d at 454.

Similarly, in *Sanchez*, the Tenth Circuit rejected the defendant's reliance upon *Woodman v. Runyon*, 132 F.3d 1330, 1344 (10th Cir. 1997) for the proposition that "accommodations are required only if an employee cannot perform the essential functions of her job."  *Sanchez v. Vilsack*, 695 F.3d 1174, 1182

Pursuant to the foregoing persuasive authority and the plain language of 29 C.F.R. § 1630.2(o)(1)(iii), a reasonable jury may conclude the Adamses reasonably requested relief from the meal tray delivery duty even if it concludes such a duty constituted only a marginal function of the Porter/Dishwasher position.  That is, given the afore-discussed obstacles Adams experienced in delivering meal trays, a reasonable jury could conclude relief from this duty would have enabled Adams "to enjoy [the] equal benefits and privileges of [his] employment as are enjoyed by [Crestwood's] other similarly situated employees without disabilities."[38]  29 C.F.R. § 1630.2(o)(1)(iii).

---

(10th Cir. 2012).  The defendant in *Sanchez* insisted that pursuant to *Woodman*, "courts should first 'determine whether the individual could perform the essential functions of the job' and then only if 'the individual is not able to perform' consider 'whether any reasonable accommodation by the employer would enable him to perform those functions.'"  *Id.* (quoting *Woodman*, 132 F.3d at 1338–39).  However, the *Sanchez* Court noted "this passage from *Woodman* states our two-part test for determining 'whether an individual is "qualified" within the meaning' of federal disability law.  *Woodman* does not speak to whether a requested accommodation is per se unreasonable."  *Id.* (quoting *Woodman*, 132 F.3d at 1339).  As in *Frazier-White*, the pertinent accommodation in *Woodman* necessarily concerned the essential functions of the plaintiff's job because the plaintiff could not constitute a qualified individual (that is, perform the essential functions) without such accommodation.  *See Woodman*, 132 F.3d at 1340–45.  The circumstances of *Sanchez*, by contrast, did not implicate this correlation.

In addition, the court notes *Stokes*, *Sanchez*, *Buckingham*, *McWright*, and *Merrill* each involved Rehabilitation Act claims.  However, because courts assess Rehabilitation Act claims pursuant to the ADA rubric, the court finds these cases nevertheless persuasive.  *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ."); *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 n.1 (11th Cir. 1997) ("Courts have universally looked to Rehabilitation Act cases as a source of guidance when construing the ADA.") (quoting *McKay v. Toyota Motor Mfg. U.S.A. Inc.*, 110 F.3d 369, 373 n.1 (6th Cir.1997)).

[38] To recapitulate, the Eleventh Circuit's decision in *Holly* illuminates a distinction between reasonable accommodations that are strictly "necessary" for (and thereby enable) the performance of essential functions, and reasonable accommodations that are not "necessary" as such, but nevertheless pertain to (and nevertheless enable) the performance of essential functions in a broader, more general sense.  That is, whereas an accommodation may manifest reasonably because it enables the employee to perform an essential job function he or she could not perform without the alteration, another

As for Adams's request to work his initial, regular schedule, although working irregular schedules may not have been an essential function of the Porter/Dishwasher position, the facts in the record do not indicate it represents a reasonable accommodation. To restate, reasonable accommodations may constitute accommodations "that enable an individual with a disability who is qualified to perform the essential functions of that position; or . . . that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii).

Adams has not demonstrated how his request for his initial, regular work schedule would have enabled him to perform the essential functions of his position, or how the requested accommodation would have enabled him to enjoy equal employment benefits and privileges enjoyed by similarly situated employees without disabilities.

---

accommodation may manifest reasonably all the same because it effectively facilitates the employee's execution of the job – even if the employee *can perform* the job's essential functions without such accommodation. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257, 1261–62 (11th Cir. 2007). Further, insofar as a reasonable accommodation may properly entail the elimination or modification of marginal functions, such an elimination or modification may constitute a reasonable accommodation that both enables the employee to (1) perform the job's essential functions, and (2) enjoy equal benefits and privileges of employment. *See* 29 C.F.R. § 1630.2(o)(1); U.S. E.E.O.C., Questions & Answers About Persons With Intellectual Disabilities in the Workplace and the Americans With Disabilities Act (Oct. 20, 2004), *available at*, 2004 WL 2368526. Thus, applying these principles to the instant case, a reasonable jury may conclude relief from the meal tray delivery duty constitutes a reasonable accommodation because (1) it would have enabled Adams's performance of the Porter/Dishwasher position's essential functions (even if he did not *require* an accommodation for the same); and (2) it would have enabled Adams to enjoy the same benefits and privileges of employment that employees without disabilities enjoy at Crestwood (i.e., performing the Porter/Dishwasher job without the unique obstacles Adams experienced vis-à-vis the meal tray delivery duty).

Rather, Mrs. Adams asserts that the initial position allowed Adams to ride the bus to and from work by himself, an independence which engendered a level of satisfaction for him and saved Mrs. Adams from picking him from work or arranging alternate transport. Although Adams's desire to achieve some modicum of independence is commendable, the court cannot discern how this achievement constitutes a reasonable accommodation that would enable him to perform the essential functions of his position or enjoy equal employment benefits and privileges exercised by other Crestwood employees without disabilities. Even with the irregular schedule, Adams did not have any trouble attending his job. Therefore, no reasonable jury can conclude that the regular work schedule request was a reasonable accommodation, and thus, Crestwood deserves summary judgment on this theory of disability discrimination.

As a result, based on the foregoing analyses the theory of liability that will proceed to trial is Adams's claim that Crestwood failed to reasonably accommodate the Adamses' request for relief from the meal delivery duty.

## CONCLUSION

For the foregoing reasons, the court **DENIES** Crestwood's Motion for Summary Judgment.

**DONE** this 1st day of December, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE